Robert Anthony REED, III, et al., Plaintiffs-Appellees,

v.

CLEVELAND BOARD OF EDUCATION, its Individual Members, and Former Superintendent Paul W. Briggs, Ohio State Board of Education, and Franklin B. Walter, Superintendent of Public Instruction, Defendants-Appellants.

Nos. 78–3520, 78–3522.

United States Court of Appeals, Sixth Circuit.

Argued June 11, 1979.

Decided Aug. 23, 1979.

George I. Meisel, Squire, Sanders & Dempsey, James P. Murphy, John H. Bustamante, Bustamante, Donohoe, Palmisano & Co., L. P. A., Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, James L. McCrystal, Jr., Cleveland, Ohio, for defendants-appellants.

James L. Hardiman, Teresa Demchak, Cleveland, Ohio, Thomas I. Atkins, Boston, Mass., Nathaniel R. Jones, NAACP, New York City, Jeremiah Glassman, John C. Hoyle, Civ. Rights Div., Dept. of Justice, Washington, D. C., for plaintiffs-appellees.

Before EDWARDS, Chief Judge, and LIVELY and ENGEL, Circuit Judges.

LIVELY, Circuit Judge.

This appeal is from an order of the district court making an interim allowance of fees to the special master and several experts appointed by the court in a school desegregation case. We affirm the order in part, vacate and modify it in part and remand for further proceedings.

I.

A class action was filed in the United States District Court for the Northern District of Ohio on December 12, 1973, seeking a permanent injunction enjoining the continuation of policies and practices which have "the purpose and effect of perpetuating racial and economic segregation in the public schools" of Cleveland, Ohio. The defendants were the Cleveland City Board of Education, its members and superintendent, the Ohio State Board of Education and the Governor and Attorney General of Ohio. The Governor and Attorney General were subsequently dismissed. Among the demands for specific relief contained in the complaint was a prayer for entry of an injunction:

(a) Requiring defendants, their agents and other persons acting in concert with them to develop and implement a "system wide" plan of desegregation which will provide for the elimination of the pattern of racial segregation in the Cleveland public school system at the beginning of the 1974–1975 school year.

Following extensive pretrial activities the court conducted a bench trial on the issue of liability from November 24, 1975 to February 5, 1976, when the case was taken under submission. On August 31, 1976 the district court filed a memorandum opinion and order finding both the Cleveland and State defendants in violation of the Constitution in the operation of the Cleveland public school system. See *Reed v. Rhodes*, 422 F.Supp. 708 (N.D.Ohio 1976). Near the end of its opinion the district court announced its intention to appoint a special master:

At this time, it is the intention of the court to appoint a special master to assist

it in the prudent exercise of its equitable jurisdiction to remedy the constitutional violations found herein. It is also anticipated that the special master will be assisted by a panel so that input may be received from legitimately affected interest groups.

*Id.* at 797.

On September 14, 1976 the district court appointed Daniel R. McCarthy special master. Mr. McCarthy is a Cleveland attorney who primarily practices taxation law. He had not been involved in the Cleveland school case and had no previous experience in such litigation. At a hearing on November 24, 1976 the presiding judge stated that appointment of the panel referred to in his opinion seemed premature, but that he intended to appoint at least two experts to assist the special master, "one who will work with the State Board of Education in the preparation of its plan, and one who will work with the Cleveland Board of Education in the preparation of its plan." The following order was then entered by the district court, on December 3, 1976:

To aid the Special Master in his appraisal of the desegregation plans to be submitted by the defendants, the Court hereby appoints Professor Edward A. Mearns, Jr. and Dr. Gordon Foster as Experts. Professor Mearns will assist with the evaluation of the plan to be submitted by the Cleveland Board of Education while Dr. Foster will assist in evaluating the plan to be submitted by the State Board of Education.

In pursuance of this objective, Professor Mearns and Dr. Foster shall observe the progress of the respective school boards towards the formulation of their desegregation plans. They shall engage in such factual investigations as they deem appropriate and shall be given complete cooperation by the State and Cleveland School Boards in their efforts to execute their offices.

The court does not intend by the appointment of these Experts to limit the responsibility of the respective school boards in the preparation of their deseg-

regation plans. The full responsibility for the preparation and timely submission of the desegregation plans lies with the respective school boards and not the Experts. The Experts are neither required nor expected to undertake an active role in the formulation of the plans to be submitted by the school board.

Professor Mearns is appointed *nunc pro tunc* as of December 1, 1976.

On December 7, 1976 the district court entered an order containing "guidelines and instructions" for the formulation of desegregation plans. Included were the following instructions concerning the special master:

The Special Master shall evaluate the constitutional sufficiency as well as the practicability of the desegregation plans. The Special Master shall prepare and submit to the Court recommendations concerning the desegregation plans submitted by the defendants, together with any revisions or alternative plans which he deems necessary to complete the desegregation of the Cleveland Public Schools.

The Special Master may conduct such hearing and investigations as he deems necessary to the performance of his duties. The Special Master and his Experts shall have complete and unrestricted access to the records of the respective school boards including but not limited to statistical data, student records, contracts and minutes of all board meetings past and present which relate to desegregation. They shall have free access to all employees and staff of the Cleveland and State School Boards. The Special Master and his Experts shall be given notice of and free access to all meetings at which desegregation plans are to be discussed. The notice shall be the same as that given to members of the respective boards and their staffs and shall contain the anticipated agenda of the meetings.

Notice shall also be given to the Special Master of all public hearings to be held by the respective school boards such as those scheduled by the Cleveland Board of Education for Wednesday, December 8, 1976 at the 28 junior high schools in the system.

Additionally, the Special Master may, as the need arises, contact and confer with the attorneys for the respective parties.

The district court entered an order on February 15, 1977 directing Dr. Foster to assist in evaluating the plan to be submitted by the Cleveland Board as well as that of the State Board. Referring to its order of December 3, 1976 the district court repeated its statement that appointment of experts did not relieve the Cleveland Board of its responsibility to formulate a plan of desegregation. The order concluded, "The Experts are not required to undertake an active role in the formulation of the plan to be submitted by the Cleveland School Board."

The special master determined from testimony of Cleveland school officials that the Cleveland Board was hampered in its "policy and decision making role in the desegregation process" by its members' lack of familiarity with the financial details of the operation of the system. He further found that there were persons occupying high administrative positions requiring a background in finance or business whose only experience was in education. The testimony which he heard "time and again demonstrated weaknesses in the administrative and management functions . . . ." (Special master's interim report to the court, App. 58).

These criticisms appear to have been supported by a report from the State Auditor's office. A state audit was conducted at the request of the Cleveland Board in seeking approval of a plan to close all the schools in the Cleveland system on or about October 17, 1977 for lack of funds. The district court had previously enjoined the Cleveland Board from closing any schools without court approval. The report of audit cited numerous deficiencies in the records and procedures of the Cleveland Board and several instances of illegal borrowing by the general fund from restricted funds.

The special master recommended that the motion of the Cleveland Board for permission to close all schools be denied. He also recommended that Ernst & Ernst, certified public accountants, "be retained to make a comprehensive survey of the financial operations of the Cleveland City School District and the management capabilities so as to assure that desegregation can be properly and expeditiously implemented." The special master filed with the court a letter from Ernst & Ernst proposing to carry out three specific functions as financial consultant to the Cleveland Board: (1) development of a five year forecast, including a student enrollment projection; (2) development of a "financial model" based on the five year forecast; and (3) the conduct of an operational appraisal of management systems, seeking to identify areas of greatest potential for cost reduction or revenue improvement.

The district court accepted the recommendation of the special master. It denied the motion of the City defendants to close the schools and ordered the appointment of Ernst & Ernst "to conduct a comprehensive survey of the financial operations of the Cleveland City School District and its management capabilities and report thereafter its recommendations regarding steps to be taken which will help assure that desegregation can be properly and expeditiously implemented." Before embarking on the proposed long-term projects Ernst & Ernst conducted a cash flow projection for the remainder of 1977, a budget comparison for 1977, an estimate of the accumulated deficit of the Cleveland system as of December 31, 1977 "on a modified accrual basis," and a projection of revenues and expenses for the year ending December 31, 1978.

## II.

On December 21, 1977 the special master filed an application for interim fees for himself and his law firm, the two court-appointed experts and Ernst & Ernst. The fees sought were $301,760 for the special master and his law firm as interim fees through October 31, 1977, $31,332.40 for Gordon Foster, $65,250 for Edward Mearns and $58,086 for Ernst & Ernst. The district court approved all these requests in full by an order entered January 10, 1978. The State Board of Education filed objections and made a motion to vacate the order of January 10. On February 9, 1978 the district court vacated the January 10th order "to enable the Special Master and experts to update the application and to consider their future retention. . . ."

Thereafter, on April 21, 1978 the special master filed an amended application for interim fees. The original applications were renewed and additional amounts were sought for services rendered through February 28, 1978. The amended application had appended an itemized statement from the special master's law firm, a similar statement from Dr. Foster, a handwritten log of Professor Mearns and statements of account from Ernst & Ernst supported by detail sheets of time and expenses. No testimony was taken on the reasonableness of the requested fees. However, the district court required counsel for the defendants to advise it of their billing to their clients for services in this case. Counsel for the defendants were also required to advise the court of charges made to the Cleveland and Ohio Boards by other Cleveland attorneys and by Ernst & Ernst and other consultants in unrelated matters. The court also directed counsel for the plaintiffs to submit to it their proposed hourly rates for work on the case.

On August 25, 1978 the district court entered an order in which the following allowance of interim fees was made:

| | |
|---|---|
| The special master and his law firm | $445,216.25 |
| plus expenses of | 12,858.00 |
| Ernst & Ernst | 134,843.77 |
| Dr. Gordon Foster | 32,300.10 |
| Professor Edward Mearns | 66,330.00 |

These allowances represented the full amounts requested, except in the case of Professor Mearns. This expert requested compensation at the rate of $75 per hour, and the district court allowed $60 per hour. The special master and members of his law firm were compensated at the average rate of $110 per hour, Ernst & Ernst at an

average rate of $60 per hour and Dr. Foster at his requested rate of $40 per hour. The City and State defendants were made jointly liable and the fees were ordered to be paid forthwith. All defendants filed notices of appeal and motions to stay execution of the August 25th order. The stay motions were denied following a hearing.

### III.

The Ohio State Board of Education has assumed the major responsibility for presenting the case for the appellants. The thrust of the argument for setting aside the allowances is that the district court failed to apply "principles of reasonableness." It is contended that the district court permitted and encouraged its appointed master and experts to range far afield from the tasks for which they were appointed and then to charge excessive fees for these services. Counsel for the master, the experts and Ernst & Ernst argue that the tasks assigned were difficult and time-consuming and the district court did not abuse its discretion in making the awards. The plaintiffs have supported the awards *in toto*, finding no abuse of discretion and asserting that the defendants were aware of the scope of activities of the master and the experts and voiced no objections. The United States filed an *amicus curiae* brief approving all the appointments and finding no fault with the allowances to the experts and Ernst & Ernst. However, the United States concludes that the record is not adequate to support the award to the special

master and suggests a remand to the district court for the purpose of receiving additional evidence and conducting further analysis with respect to the compensation of the special master.

### A. The Special Master

None of the parties disputes the authority of the district court to appoint a special master in this case. The record clearly discloses the existence of "exceptional condition[s]" requiring it.[1] Further, it is a fact that public law litigation often places a trial judge in a position where his role is necessarily somewhat different from that performed in more traditional cases. This is especially true in the remedial phase of a school desegregation or institutional reform case. School and institutional financing and administration are subjects with which few judges have more than a passing familiarity. Yet, when litigation exposes constitutional violations in public institutions a court of equity must take steps to eliminate them. In accomplishing this result trial courts frequently issue orders which require fundamental changes in the administrative and financial structures of the institutions involved. In order to accomplish these ends with fairness to all concerned a judge in equity has inherent power to appoint persons from outside the court system for assistance.[2]

Though the breadth of the special master's assignment appears to have expanded as the case progressed, this is understandable. It was impossible to anticipate every

---

1. Rule 53, F.R.Civ.P., provides for the appointment of masters. The provisions for a reference in a particular case are found in 53(b):

 **(b) Reference.** A reference to a master shall be the exception and not the rule. In actions to be tried by a jury, a reference shall be made only when the issues are complicated; in actions to be tried without a jury, save in matters of account and of difficult computation of damages, a reference shall be made only upon a showing that some exceptional condition requires it.

 Rule 53 codified a long-standing practice of the federal courts, as described in *Ex Parte Peterson*, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 (1920), of appointing "persons unconnected with the court to aid judges in the performance of specific judicial duties, as they may arise in

the progress of a cause." 253 U.S. at 312, 40 S.Ct. at 547. *See*, Note, *Masters and Magistrates in the Federal Courts*, 88 Harv.L.Rev. 779 (1975). References to masters have been disapproved, however, when the "exceptional circumstances" requirement of Rule 53(b) was lacking. *See La Buy v. Howes Leather Co.*, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957); *TPO, Incorporated v. McMillen*, 460 F.2d 348 (7th Cir. 1972).

2. The roles of judges and masters in public law litigation have been the subject of several recent essays. *See, e. g.*, Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv.L. Rev. 1281 (1976); Note, *Implementation Problems in Institutional Reform Litigation*, 91 Harv.L.Rev. 428 (1977).

744

problem which would be encountered in fashioning a remedy. We do not believe that the special master exceeded the bounds of his appointment or that the defendants were unaware of the expansion of his duties and responsibilities.

 The State Board contended in the district court, and repeats the argument here, that the special master should not be compensated for work performed subsequent to this court's remand of the case following an appeal from the district court's liability decision. After the appeal from the district court's order of August 31, 1976 had been fully briefed and argued in this court the Supreme Court decided *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977). This court then remanded *Reed v. Rhodes* to the district court for reconsideration in the light of *Brinkman*. (Unpublished order in appeal No. 76–3602, filed July 20, 1977). Following remand the special master continued to work on formulation of a system-wide desegregation plan. The district court offered the parties an opportunity to present additional evidence following remand, but none chose to do so. The court then issued a second liability opinion on February 6, 1978, finding that its earlier holding was unaffected by the *Brinkman* decision. *Reed v. Rhodes*, 455 F.Supp. 546 (N.D.Ohio, 1978).

We do not believe that the district court erred in requiring the special master to continue with his assigned tasks following remand. This court did not vacate the district court's finding that the Cleveland and State defendants had operated the Cleveland public schools in violation of the equal protection rights of black pupils. The August 31, 1976 findings of widespread intentional segregative acts were sufficient if affirmed to support a system-wide remedy under the standards of *Brinkman*. Though there was the possibility that these findings might be overturned on appeal from the February 6, 1978 order, the risk of some

wasted effort and needless expense in such an event is inherent in a case of this kind. The alternative of "stopping the wheels" and incurring further delay and expense if the district court's findings should ultimately be affirmed is unacceptable. In view of the extensive findings of violations contained in the district court's August 31, 1976 opinion the members of the plaintiff class were entitled, at the least, to have planning for a remedial decree go forward.

The defendants have not questioned the amount of time for which the special master and his associates have claimed compensation. However, they contend vigorously that the hourly rates and the total allowance are unreasonable. The district court stated in its memorandum opinion of August 25, 1978—

> The Court finds, based on the information supplied by counsel, that the hourly rate of $110 per hour charged by the Special Master is comparable to the prevailing rate for legal fees in the Cleveland area for expert attorneys in cases of this complexity. In making its assessment, the Court has considered the rates charged by private counsel in this case, which range from $70 to $130 per hour for experienced trial attorneys, centering at about $100 per hour. Neither the Special Master nor any of the reporting attorneys were experts in desegregation litigation or constitutional law prior to this law suit. (App. 601–602) (footnote omitted).

Taking note of standards set forth in *Newton v. Consolidated Gas Co.*, 259 U.S. 101, 42 S.Ct. 438, 66 L.Ed. 844 (1922),[3] the district court concluded that payment to the special master and his law firm at the rate of $300,000 per year was reasonable. We disagree.

Without denigrating in any way the ability or performance of Daniel McCarthy or his associates in the present case we conclude that the allowance of $445,000 is excessive. The district court stated that it

---

**3.** In *Newton* the Supreme Court stated that judicial salaries are "valuable guides" in setting fees of masters, but that a higher rate is usually necessary to obtain skilled and experienced people for exacting, temporary employment. 259 U.S. at 105, 42 S.Ct. 438.

had considered only the top rates billed by Cleveland law firms because, "unlike private counsel, who evidently employ persons at a lower rate to perform tasks requiring a lesser degree of skill and experience, the special master's work was confined to that requiring a high degree of expertise and judgment." (App. 602, n.*). An examination of the itemized statements of the special master indicates that many hours were spent gathering information from various sources, telephoning and corresponding with individuals and groups interested in the litigation. Activities such as these were not as demanding as conducting hearings, meeting with the presiding judge and the attorneys, or finally evaluating the plans submitted by the defendants. Further, in dealing with the most difficult problems, the special master had the benefit of a thorough audit by a public accounting firm, advice on peculiarly educational problems from a nationally recognized authority on educational administration and the advice of a constitutional law professor. The record also reveals that much of the information gathering was performed by associates, who also attended meetings on behalf of the master. The two associates who logged the greatest amount of time on this case had been admitted to the bar in 1973 and 1975, though both had qualified as certified public accountants somewhat earlier. None of these factors would justify a total disallowance of fees for any of the hours spent by the special master and his firm. However, they must be considered along with principles developed by the courts respecting reasonable compensation in public interest cases.

In *Hart v. Community School Board of Brooklyn,* 383 F.Supp. 699 (E.D.N.Y.1974), aff'd, 512 F.2d 37 (2d Cir. 1975), Judge Weinstein surveyed English and American precedents for the use of experts and masters and concluded, "Expert assistance is available to federal courts through two means when it is not provided by the parties. The court has the power to call expert witnesses. It may also appoint special masters." *Id.* at 762. He appointed in that school desegregation case an "expert master" and defined his role as follows:

The expert in this case must assist the court by coordinating and evaluating remedial proposals that defendants and others are in the process of preparing pursuant to court order. He must serve an investigatory and consultative function among the parties and advise this court in technical areas so it may approve an effective remedial order. In a sense, he must bridge the gap between the court as impartial arbiter of plans placed before it and advocates protecting their clients' positions that are often narrower than that of society at large.

*Id.* at 764.[4]

As in the present case, appointment of the master followed a determination of liability in *Hart.* The district court there relied upon the special master to coordinate the efforts of the parties. The particular problem in *Hart* led the district court to appoint a special master with "expertise in government housing laws," *Id.* at 767, just as the economic considerations in the present case determined that the master should be especially qualified in financial matters.

Though the compensation of the master in *Hart* was not set in advance, the district court noted that counsel in the case had suggested that "a reasonable fee would be based upon about half that obtainable by private attorneys in commercial matters." *Id.* at 767. This reflects a generally accepted principle that the highest range of fees in private litigation is not a proper basis for compensation of masters. In a patent case where a special master was appointed, the United States District Court for the Northern District of Ohio stated:

The Court sitting in equity does not feel at liberty to allow compensation to be paid by litigants upon the same basis as

---

4. *See* Berger, *Away from the Court House and Into the Field: The Odyssey of A Special Master,* 78 Col.L.Rev. 707 (1978). The author, Curtis J. Berger, was the special master appointed by Judge Weinstein in the Brooklyn case.

might be the case in private relationship. *Robertshaw-Fulton Controls Co. v. Patrol Valve Co.*, 106 F.Supp. 427 (1952), *aff'd*, 210 F.2d 146 (6th Cir. 1954).

■ We believe that many of the considerations which apply to the setting of attorneys' fees in public litigation apply to setting the fees of a special master. In *Wyatt v. Stickney*, 344 F.Supp. 387, 410 (M.D.Ala. 1972), *modified in part*, 503 F.2d 1305 (5th Cir. 1974), a case involving the award of fees for plaintiffs' attorneys who successfully attacked the constitutionality of conditions at Alabama mental institutions, the court referred to the fees of $20 per hour for out-of-court work and $30 per hour for in-court time permitted under the Criminal Justice Act. Judge Johnson concluded that these fees for representing indigents in criminal cases establish "a reasonable basis upon which lawyers can carry out their professional responsibility without either personal profiteering or undue financial sacrifice." (citation omitted). See also, *Oliver v. Kalamazoo Bd. of Education*, 576 F.2d 714, 718 (6th Cir. 1978) (Weick, Circuit Judge, concurring.)

■■ Upon consideration of the entire record the court concludes that the district court's allowance to the special master and his firm is excessive. Under the circumstances of this case we do not believe the fee schedule of the Criminal Justice Act is sufficient. However, we do believe that fair compensation can be determined by application of the *Hart* formula of "about half that obtainable by private attorneys in commercial matters." Accordingly we find that a reasonable rate of compensation for special master Daniel R. McCarthy is $65 per hour which is one-half the highest Cleveland rate found by the district court, and approximately two-thirds the average rate of experienced Cleveland trial attorneys. For the associates in his law firm who assisted him an allowance of $40 per hour is approved. The interim award for services through February 28, 1978 is calculated as follows:

| | |
|---|---|
| Daniel R. McCarthy 2406 hours at $65 | $156,390 |
| Associates of McCarthy 1777.75 hours at $40 | 71,110 |
| Expenses | 12,858 |
| Total award to McCarthy, Lebit, Crystal, Kleinman & Gibbons Co., L.P.A. | 240,358 |

### B. Ernst & Ernst, Inc.

■ The record supports the finding of the district court that the financial records and internal operating procedures of the Cleveland School System were not sufficiently complete, accurate or sophisticated to furnish the information required by the special master and the district court. Though it added greatly to the expense of this litigation the appointment of outside auditors was justified by the facts. No one has questioned the hours shown on the billings of Ernst & Ernst or the rates charged. Both the court and the special master made extensive use of the Ernst & Ernst audits and projections. The award of the district court to Ernst & Ernst in the amount of $134,843.77 is affirmed.

### C. The Experts

In appointing Dr. Foster and Professor Mearns as experts in this case the district court cited Rule 706, Federal Rules of Evidence. However, Rule 706 refers only to the appointment of expert witnesses. Though Dr. Foster testified for the plaintiffs in the earlier liability trial of *Reed v. Rhodes*, he did not function as an expert witness after his appointment by the court. Dr. Foster and Professor Mearns were not called as expert witnesses by the court and they were not examined under oath by the parties. See *United States v. Cline*, 388 F.2d 294, 296 (4th Cir. 1968); *Danville Tobacco Ass'n v. Bryant-Buckner Associates, Inc.*, 333 F.2d 202, 208 (4th Cir. 1964). We believe their appointment was as expert advisors or consultants to the special master and the court, and the authority for such appointment derives, not from Rule 706, but either from Rule 53, F.R.Civ.P., *Hart v. Community School Board, supra*, 383 F.Supp. at 764, or from the "inherent" power of the court, *Ex parte Peterson, supra*, 253 U.S. at 312, 40 S.Ct. 543.

■ Dr. Foster is a nationally recognized authority on school administration, particularly with respect to the educational considerations to be taken into account in the implementation of court-ordered desegregation. Though Dr. Foster appeared earlier in this case as an expert witness for the plaintiffs, the defendants did not object to his subsequent appointment by the court. None of the parties disputes either the fact that he rendered services to the master, or their value. Accordingly, the allowance to Dr. Foster of $32,300.10, computed at $40 per hour, is affirmed.

■ The appointment of Professor Mearns presents the court with a more complex problem. In explaining the selection of Mr. McCarthy as special master the district court pointed out that he was experienced in accounting, business and finance, skills which the court itself did not possess. This same reasoning would support the appointment of Dr. Foster, whose expertise in educational matters was not shared by the special master or the court. On the other hand, Professor Mearns is primarily a teacher of constitutional law, an area with which the experienced trial judge in this case has been involved throughout his career. The use of masters is permitted because they improve the judicial process by bringing to the court skills and experience which courts frequently lack. However, courts are presumed to be informed on legal issues, and the determination of purely legal questions is the responsibility of the court itself. The court is not without assistance in performing this duty. The attorneys in a given case are required to inform the court of their views of the controlling law. Each district judge is provided at public expense with a staff which includes qualified law clerks. In addition, the United States was designated as *amicus curiae* in the present case and participated actively in the remedy phase, appearing through attorneys in its Civil Rights Division.

It is difficult to determine from the record exactly what duties Professor Mearns actually performed. He was appointed primarily to "assist with the evaluation of the plan to be submitted by the Cleveland Board of Education . . . ." Yet, on February 15, 1977 the district court directed Dr. Foster to assist in evaluating the plan to be submitted by the Cleveland Board as well as that of the State Board. There was no corresponding assignment of Professor Mearns to assist with evaluation of the State plan. The record discloses that Professor Mearns met with the court and the judge's law clerks on a number of occasions and that he wrote memoranda and drafted orders for the court. Our conclusion is that Professor Mearns functioned frequently as an advisor to the court on constitutional law issues. These activities and communications did not occur in open court and the parties had no opportunity to question Professor Mearns as a witness.

■ The use of masters in non-jury cases has been criticized on three main grounds: it causes delay in the proceedings, it adds to the expense of litigation and it often leads to an abdication of the judicial function. See Kaufman, *Masters in the Federal Courts: Rule 53,* 58 Colum.L.Rev. 452 (1958). The appointment of the master in this case does not appear to have caused delay. However, the appointment of two experts to advise the master has added significantly to the expense of this litigation. In view of Mr. McCarthy's lack of experience in educational matters, he clearly required the assistance of someone with Dr. Foster's qualifications. However, the same justifications did not exist for the appointment of Professor Mearns, and we do not approve the practice of appointing legal advisors to a master or the court. To the extent that the master was not qualified to make recommendations to the court because of a lack of experience in constitutional law, he should have submitted such legal issues to the court. The court could rely on his own experience and learning and the assistance of his staff and all counsel in the case. The District Judge clearly had no intention to abdicate his judicial responsibility in this case. Nevertheless, to the extent that he relied on advice received in cham-

bers from a "legal expert" there was a partial abdication of his role. Whatever may have been the practice of Lord Mansfield[5] the adversary system as it has developed in this country precludes the court from receiving out-of-court advice on legal issues in a case. He must depend on his own resources, which include the work of his staff and the offerings of counsel.

 This court realizes that a case of the magnitude of the present one puts a severe strain on the resources of a district court. It has been recognized that courts may seek outside help in order to accommodate the public interest in achieving prompt and just solutions to serious problems involving institutions such as public schools. Thus, experts on many nonlegal subjects have been appointed, either as masters or expert witnesses. In the absence of an express agreement by all the parties, however, a court may not avail itself of legal advice from one who is neither counsel in the case nor subject to the oath and discipline imposed on members of his staff.

We have reviewed the statement which Professor Mearns submitted with his application for fees. He requested payment for 1105.5 hours devoted to this case between December 1, 1976 and February 28, 1978. It is our conclusion that 322.5 hours were spent on activities which were not included in the statement of his appointment and involved research for the court, meetings with the court and his staff and drafting orders and memoranda. These are not services for which the defendants should be required to pay. Though nearly 300 of the remaining hours are not clearly within the description of Professor Mearn's duties, doubts have been resolved in his favor with respect to this portion of the claim. Thus, we conclude that Professor Mearns is entitled to be paid for 783 hours.[6]

 Though Dr. Foster requested payment at the rate of $40 per hour, we believe a somewhat higher rate would have been justified had he requested it. Since Professor Mearns is a full-time member of the faculty of a law school in Cleveland and does not have the overhead of a private law office, we conclude that $50 per hour will provide fair and reasonable compensation for his services in this case and is commensurate with the $65 rate allowed Mr. McCarthy.

Accordingly, Professor Edward Mearns is allowed a fee of $39,150.

## CONCLUSION

 Courts must never lose sight of the fact that the fees in a case of this kind are paid from public funds. Every effort should be made to keep these expenses as low as is reasonably possible. Where appointment of masters and outside consultants is deemed necessary, the better practice is that followed by the district court in *Amos v. Bd. of School Directors of the City of Milwaukee,* 408 F.Supp. 765 (E.D.Wis. 1976), *aff'd sub nom., Armstrong v. Brennan,* 539 F.2d 625 (7th Cir. 1976), *remanded on other grounds,* 433 U.S. 672, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977). There Judge Reynolds set the fee of the special master ($50 per hour) at the time of his appointment and directed him to submit monthly vouchers. 408 F.Supp. at 824. When this procedure is followed the parties know the rate of compensation in advance and are aware of the actual costs of the reference as they accrue.

The order of the district court entered August 25, 1978 is affirmed in part and vacated and modified in part, as indicated herein. The case is remanded to the district court for entry of an order in conformity with this opinion.

5. Lord Mansfield used a "special jury" of experts in mercantile cases and once announced that he had "conversed with gentlemen experienced in adjustments" in deciding an insurance case. *See* Beuscher, *The Use of Experts by the Courts,* 54 Harv.L.Rev. 1105 (1941).

6. Since there was no objection to the appointment of Professor Mearns, all his work related to assisting the special master will be compensated. In the future, specific agreement will be required for the appointment of a legal advisor to a special master.