RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0024p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

                      *Plaintiff,*

PEOPLE FIRST OF TENNESSEE, et al.,
        *Intervenors-Appellees/Cross-Appellants,*

    *v.*

STATE OF TENNESSEE; BILL HASLAM, in his official capacity as Governor of the State of Tennessee; JAMES M. HENRY, in his official capacity as Commissioner of the Department of Intellectual and Developmental Disabilities; MARK EMKES, in his official capacity as Commissioner of the Tennessee Department of Finance and Administration,

        *Defendants-Appellants/Cross-Appellees.*

Nos. 12-6258/6341

_____

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:92-cv-02062—Jon Phipps McCalla, District Judge.

Argued: June 25, 2014

Decided and Filed: February 10, 2015

Before: ROGERS and KETHLEDGE, Circuit Judges; MALONEY, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Michael W. Kirk, COOPER & KIRK, PLLC, Washington, D.C., for Appellants/Cross-Appellees. Earle J. Schwarz, THE OFFICES OF EARLE J. SCHWARZ, Memphis, Tennessee, for Appellees/Cross-Appellants. **ON BRIEF:** Michael W. Kirk, Adam R.F. Gustafson, COOPER & KIRK, PLLC, Washington, D.C., Diane Stamey Dycus, OFFICE

_____

[*]The Honorable Paul L. Maloney, Chief United States District Judge for the Western District of Michigan, sitting by designation.

OF THE TENNESSEE ATTORNEY GENERAL, Jonathan Paul Lakey, PIETRANGELO COOK, PLC, Memphis, Tennessee, for Appellants/Cross-Appellees.  Earle J. Schwarz, THE OFFICES OF EARLE J. SCHWARZ, Memphis, Tennessee, for Appellees/Cross-Appellants.

————————

**OPINION**

————————

KETHLEDGE, Circuit Judge.  This is a civil-rights case in which the district court entered a consent decree over 20 years ago.  Since then, People First of Tennessee has presented 19 applications for attorneys' fees to the district court.  The State of Tennessee consented to pay every dollar of fees requested in the first 18 applications filed by People First—a total of about $3.6 million, including over $400,000 for the period at issue here.  But the State objected to People First's 19th application, which for the most part sought fees for a contempt motion that the district court had stricken from the docket and that People First never renewed.  The 19th application also sought fees for hours that People First's attorneys had chosen to spend monitoring the State's compliance with the consent decree—even though the State had already paid $10.6 million in fees to a monitor whom the court had appointed for that same purpose.  Despite those circumstances, the district court awarded People First $557,711.37 pursuant to the application, holding that People First had been a "prevailing party" with respect to its contempt motion.  We respectfully disagree, and reverse.

I.

A.

Before this litigation began, Tennessee operated the Arlington Developmental Center, an institutional home for people with mental disabilities.  In 1992, the United States sued Tennessee under the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997a, alleging that, among other things, Tennessee had failed to provide Arlington's residents with adequate food, medical care, supervision, and shelter.  After a trial on the merits, the district court found that Arlington's conditions violated the due-process rights of its residents.  The court therefore ordered the State to submit a plan to improve conditions there.

In 1994, the court approved a comprehensive consent decree—known as the "Remedial Order"—that, among many other things, enjoined Tennessee from admitting new residents to Arlington, required the State to improve its care of residents there, and over time required the State to transfer all of Arlington's residents to appropriate caregivers in the surrounding community. The consent decree also required that Tennessee pay for a court-appointed monitor, who was tasked with overseeing the State's compliance with the decree and reporting her findings to the court and the parties.

Meanwhile, People First, a disability-rights organization, brought a separate class action against the State based on similar allegations. After entry of the consent decree, the district court allowed People First to intervene in this case. The court also certified a class comprising all persons who resided at Arlington "on or after December 12, 1989," and "all persons at risk of being placed" there. Certification Order at 23.

Over the next several years, further litigation led to "multiple findings of contempt, additional plans of corrections, settlement agreements, and consent orders." *United States v. Tennessee*, 615 F.3d 646, 651 (6th Cir. 2010). The contempt orders required Tennessee to pay substantial fines to the court clerk. In 2003, the court entered an order setting forth mandatory "guidelines" governing disbursement of those fine monies. In 2010, Tennessee transferred the remaining residents out of Arlington and closed the facility. In 2013, the district court approved an exit plan, and all parties expect this case to end soon after these appeals are decided.

B.

These appeals center on work that People First performed on a contempt motion filed in 2008. In that motion, People First argued that Tennessee had violated the court's orders in numerous ways: that Tennessee had reduced the rates it paid to community caregivers for services provided to class members; that it had failed to provide adequate health care, nursing, and therapy services to class members; that it had changed the manner in which it scored the results of the "assessment tool" (the "Inventory of Client and Agency Planning" or "ICAP") that it used to determine reimbursement rates for providers; that it had discontinued supplemental payments to providers who cared for class members with "complex physical and behavioral challenges"; that it had failed to issue a written policy governing subsidies for community

housing; that it had reduced funding for advocacy services; and that it had restricted enrollment in home and community-based services.

Not long after People First filed the contempt motion, Tennessee became aware of ex parte emails between the court-appointed monitor, Dr. Nancy Ray—whose duty was to serve as a neutral "agent of the court," June 10, 2009 Order at 6—and People First. The court later found, based upon those emails, that "the Court Monitor and counsel for People First appear to have been working together to advance People First's position in the instant litigation." June 10, 2009 Order at 4. Tennessee filed motions (i) to compel discovery of emails between Dr. Ray and People First, (ii) to exclude Dr. Ray's testimony from an evidentiary hearing regarding the contempt motion, and (iii) to suspend her from further monitoring activities. The district court eventually granted the motion to compel, denied the motion to exclude Dr. Ray's testimony, and denied the motion to suspend her—though the court did suggest that Dr. Ray's contacts with People First had been "unwise." March 23, 2010 Order at 5.

In July 2009, the district court heard five days of testimony regarding the contempt motion. At the parties' request, however, the court suspended the hearing for settlement talks. Two months later, the court struck the contempt motion from the docket without prejudice. People First never refiled the motion.

By June 2011—almost two years later—Arlington had closed its doors and this case was nearing its conclusion. But the court clerk still held approximately $4.5 million in fines paid by the State—monies that would revert to the federal government unless the court disbursed them before dismissal of the case. The parties avoided that outcome by reaching agreement on two orders (collectively, the "fine-money orders") that directed the court clerk to disburse the money in two ways. The first order (the "Housing-Foundation Order") directed the clerk to disburse approximately $3 million to a new non-profit entity, the Housing Foundation of Tennessee, for the purpose of purchasing, maintaining, and leasing "housing stock" for the benefit of class members and other people with mental disabilities. The second order (the "SIS Order") directed the clerk to disburse the remaining $1.5 million to the State, in three equal installments, on condition that Tennessee would use the money to cover its costs in transitioning from the ICAP assessment tool to a new assessment tool, the Supports Intensity Scale (SIS). Neither order made

any reference to the 2008 contempt motion; and both orders (by incorporating the court's earlier "guidelines" from 2003) barred the State from using any of the disbursed funds "to achieve compliance with the Remedial Order or subsequent court orders[.]" R. 1826 at 3.

In September 2011, the district judge who had presided over the case for the preceding ten years—including during litigation of People First's 2008 contempt motion and when the fine-money orders were entered in 2011—was appointed to this court. Two months later, People First filed its 19th application for attorney's fees under 42 U.S.C. § 1988. The application sought over $800,000 in fees for People First's work on the contempt motion—including its work defending Dr. Ray—and for People First's own "general monitoring activities." The State objected to the application. Up to that point, Tennessee had already paid People First over $3.6 million in fees, including over $400,000 for work done in the time period covered by the new request. By then the State had also paid $10.6 million to the court-appointed monitor. The district court held, however, that People First was a "prevailing party" under § 1988 with respect to its work on the 2008 contempt motion and its "general monitoring" activities. Ultimately—after reducing the hours and hourly rate requested by People First—the court awarded People First $557,711.37 in fees and expenses. The State appealed the award, and People First cross-appealed the reduction of its hours and hourly rate.

## II.

We review de novo the question whether People First was a prevailing party for purposes of the fees awarded by the district court. *Binta B. ex rel. S.A. v. Gordon*, 710 F.3d 608, 617-18 (6th Cir. 2013).

## A.

Tennessee challenges the district court's award of fees for People First's work on the contempt motion, which generated most of the fees—about $450,000—at issue here. A district court may award a "reasonable attorney's fee" to a "prevailing party" in a federal civil-rights action. 42 U.S.C. § 1988. A prevailing party is "one who has been awarded some relief by the court"—say, by entry of a consent decree or judgment in the party's favor. *Buckhannon Board and Care Home, Inc. v. West Virginia Dep't of Health & Human Resources*, 532 U.S. 598, 603

(2001). The party seeking fees bears the burden of proving that it was a prevailing party with respect to the work done to generate them. *Binta B.*, 710 F.3d at 626.

A plaintiff's status as "prevailing" is relatively easy to determine as to work done to obtain a decree or judgment that grants relief. In those cases the work precedes the relief, and thus the causal connection between work and relief is usually clear. The prevailing-party question becomes more complicated, however, when a plaintiff seeks an award for work done *after* the court grants relief—say, work to defend or enforce a decree that the district court entered years before. That kind of work frequently does not result in new relief, but might—or might not, depending on the facts—preserve relief that the court had already granted.

Our decision in *Binta B.*—issued after the fee award here—established the standard in this circuit for determining whether a party is "prevailing" for purposes of work "performed enforcing or defending [a] prior decree[.]" 710 F.3d at 626. Specifically, to recover fees for such work, a plaintiff must "show that the work was 'necessary to enforce' the prior decree or judgment and resulted in a court order or agency determination that at the very least 'secured plaintiff['s] initial success in obtaining the consent decree.'" *Id.* (quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 558-59 (1986)) (brackets omitted). That standard, by its terms, contains three elements: first, that the work was necessary to enforce the prior judgment or decree; second, that the work resulted in a court order or agency determination; and third, that the order or determination at least secured the plaintiff's initial success in obtaining the decree. *Id.*

Although Tennessee argues that People First proved none of these elements, we focus on the second one here. In most cases where a motion "result[s] in a court order[,]" *id.*, the order is simply one that grants the motion in whole or in part. But we have no such order here: the district court struck People First's contempt motion from the docket, and People First never renewed it. That puts People First in the difficult position of seeking fees for a motion that the district court never granted.

In the district court's order granting in part People First's 19th application, however, the court (which had not itself presided over the contempt proceedings) stated that the contempt motion led to negotiations between the parties, which then led to the fine-money orders. But the

court offered no basis for that statement, which, with due respect, was merely conclusory. People First likewise points to virtually nothing in the record to support the district court's conclusion.

Nor, after careful review of the record, do we find much support for the idea that the contempt motion resulted in the fine-money orders. Those orders, to reiterate, did two things: the Housing-Foundation Order disbursed $3 million to a new nonprofit entity to obtain "housing stock" for class members; and the SIS Order disbursed $1.5 million to the State for the purpose of transitioning from the ICAP tool to the SIS tool. Most of the allegations in the contempt motion—that the State had reduced the rates it paid to community caregivers, that it had cut funding for "advocacy services" for class members, that it had ended supplemental payments for class members with particularly acute needs, that it had "restrict[ed] enrollment into home and community-based waiver services," that it had failed to deliver adequate "health and behavioral services to class members"—had little to do with the creation of a non-profit housing entity or the transition to a new assessment tool.

The contempt motion did include two other allegations that were related to the subject matter of the fine-money orders. But that relation was loose at best. One allegation was that the State "ha[d] changed scoring of the assessment tool [*i.e.*, ICAP]" in a way that reduced "reimbursement rates" to some class members. That allegation shares the general subject of "assessment tools" with the SIS Order. But the commonality ends there: the SIS Order says nothing about the State's scoring of ICAP, but makes clear that the parties agreed to switch to SIS simply because they thought it was a better tool. *See* SIS Order at PP2-3. Likewise, the second allegation—that the State lacked a "written policy governing the payment of residential cost subsidies"—does share, in a very general way, the subject of "housing" with the Housing-Foundation Order. But that order says nothing about the State's absence of a written subsidy policy, or even about the State's residential subsidies at all; instead, the order disburses $3 million to an altogether new entity for purposes of obtaining housing stock for class members. (It also bears mention that, of the roughly 2300 hours for which the district court awarded fees for work on the contempt motion, less than 53 hours involved work specifically related to these

two allegations.)  The substantive overlap between the motion and these two orders, therefore, is minimal.

Two other facts provide affirmative reason to think that the contempt motion did not result in the fine-money orders.  The first is that People First has never granted Tennessee a release for any of the claims set forth in the contempt motion.  Tennessee presumably would have gotten a release if the fine-money orders had represented a negotiated resolution of the contempt motion.  Second, the terms of the fine-money orders—by their incorporation of the court's 2003 mandatory guidelines—expressly bar the State from using the disbursed funds "to achieve compliance with the Remedial Order or subsequent Court orders[.]"  It is hard to fathom how two disbursement orders that, by their express terms, *prohibit* the State from using the disbursed funds to achieve compliance with the court's orders, amount to a resolution of a contempt motion that expressly sought compliance with the court's orders.  In summary, there is little reason to conclude that the contempt motion resulted in the fine-money orders, and ample reason to think they did not.

The record in this case leaves the distinct impression that the relevant inquiry under § 1988 was inverted from what it is supposed to be.  That inquiry is supposed to begin with an order granting relief and then proceed to ask what fees were necessary to obtain it.  But here there is every indication that People First began with an orphaned half-million of fees and then sought some plausible order to attach them to.  One can sympathize with People First's desire to get paid for work done in good faith and for an admirable cause.  The plain implication of cases like *Buckhannon* and *Binta B.*, however, is that not every hour worked in federal civil-rights cases is compensable.

"Cases are better decided on reality than on fiction."  *In re Dry Max Pampers Litigation*, 724 F.3d 713, 721 (6th Cir. 2013) (internal quotation marks omitted).  And by all appearances the reality here is straightforward:  the parties agreed to the fine-money orders to prevent the impending reversion of those monies to the federal government, not to resolve an otherwise-fruitless contempt motion filed three years before.  People First has not established that it was a prevailing party on its contempt motion.  To the contrary, if any party prevailed on that motion, it was the State.

B.

The State also challenges the district court's award of approximately $100,000 in fees for "general monitoring work." In *Delaware Valley*, the Supreme Court upheld an award of fees for post-judgment monitoring work that had been "necessary to enforce the remedy ordered by the District Court[.]" 478 U.S. at 559. Thus, a plaintiff must make at least that showing of necessity to be a prevailing party for post-judgment monitoring.

The circuits are split, however, as to whether a plaintiff must also show that the post-judgment monitoring resulted in a court order. In *Buckhannon*, the Supreme Court held that the term "prevailing party" as used in § 1988 requires an "alteration in the legal relationship of the parties"—*e.g.*, a court order or agency determination—to support an award of fees. 532 U.S. at 605. The Seventh Circuit has read *Buckhannon* to mean that, if post-judgment monitoring "does not produce a judgment or order, then under the rule of *Buckhannon* it is not compensable." *Alliance to End Repression v. City of Chicago*, 356 F.3d 767, 771 (7th Cir. 2004). Other circuits hold that post-judgment monitoring work can be compensable without a court order. *See Cody v. Hillard*, 304 F.3d 767, 774-75 (8th Cir. 2002); *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 451-52 (9th Cir. 2010); *Johnson v. City of Tulsa*, 489 F.3d 1089, 1108-09 (10th Cir. 2007).

Our circuit has yet to stake out a clear position on this issue. In *Binta B.*, we read *Delaware Valley* and *Buckhannon* together to require a plaintiff to meet the three-part test described above (*i.e.*, to show that the work was necessary to enforce the prior decree, that the work resulted in an order, and that the order secured the plaintiff's initial success) in order "to recover fees for work performed enforcing or defending [the] prior decree[.]" *Binta B.*, 710 F.3d at 626. The State argues we should simply apply that test here. But the court in *Binta B.* stated that its opinion did not "focus" on monitoring work, *id*. at 621 n. 7—even though the opinion did reverse an award of fees for "investigating" work that seems indistinguishable from monitoring work. *Id*. at 632-33. Whether *Binta B.* is dicta as to post-judgment monitoring work, therefore, is unclear.

But in this case we need not answer that question or take sides in the circuit split. For even under *Delaware Valley*, as discussed above, a plaintiff must at least show that its post-judgment monitoring work was "necessary to enforce the remedy ordered by the District

Court[.]"  478 U.S. at 559.   Whether a plaintiff's post-judgment monitoring is necessary, of course, depends on the facts of the particular case.   And the colossal fact in this case is that the State has already paid $10.6 million to the court-appointed monitor.   What People First must show, therefore, is not merely that some "monitoring was necessary" in this case, but also that $10.6 million of monitoring by the court-appointed monitor was not enough, and that People First was thus entitled to do another $100,000 of self-appointed monitoring at taxpayer expense. People First has not made that showing, or even tried.   Nor did the district court's opinion explain why there was some genuine necessity for People First to add to the monumental amount of monitoring for which the State had already paid.   For these reasons standing alone, People First is not entitled to fees for its self-appointed monitoring.

The cases upon which People First relies are plainly distinguishable on their facts.   In *Cody*, 304 F.3d at 771-72, and *Prison Legal News*, 608 F.3d at 449-50, there was no court-appointed monitor at all; and in *City of Tulsa*, 489 F.3d at 1094, the decree limited the fees of the court-appointed monitor to $36,000 per year—a miniscule sum in comparison to the amounts paid out here.   That the plaintiffs' monitoring work was necessary in those cases, therefore, does not mean that People First's monitoring was necessary here.

Our own decision in *Hadix v. Johnson*, 143 F.3d 246 (6th Cir. 1998), is inapposite for a different reason.   There, per the law of the case, the consent decree itself provided that the plaintiffs should be considered prevailing parties for purposes of post-judgment monitoring work.  143 F.3d at 256.   The plaintiffs therefore did not need to make any additional showing to establish prevailing-party status for those purposes.   But here the Remedial Order appoints Dr. Ray, not People First, to monitor the State's compliance with the court's orders.   It is true, as People First points out, that a different order states that both People First and the United States should be "provided free access, *as necessary*, for monitoring the adequacy and appropriateness of placements."  Community Plan Order ¶ 7 (emphasis added).   That same provision also states that "[a]ll reviews of community facilities by either the United States or People First, however, must first be approved by the Monitor."  *Id*.   But People First has shown neither necessity, nor pre-approval by the Monitor, nor that its putative monitoring work otherwise falls within the narrow confines of this provision.   Finally, suffice it to say that, contrary to People First's

assertions on appeal, the district court's class-certification order—specifically its finding that People First's counsel was competent to represent the class—does not remotely establish People First's status as a prevailing party for purposes of post-judgment monitoring.

Judge Lively once observed that "[c]ourts must never lose sight of the fact that the fees in a case of this kind are paid from public funds." *Reed v. Cleveland Board of Education*, 607 F.2d 737, 748 (6th Cir. 1979). That admonition has special force here. Monitoring arrangements by nature are susceptible to excessive costs—because the entity that approves monitoring fees (the district court) is not the entity that pays them (the monitored party). A district court must therefore be vigilant to ensure that the work giving rise to monitoring fees—whether done by counsel or a court-appointed monitor—was truly necessary. People First made no showing that its self-appointed monitoring was necessary here, so the court's award of those fees must be reversed.

\* \* \*

People First's work over the course of this litigation has brought important benefits to members of the class. For good reason, therefore, People First has been paid $3.6 million for that work. But just as consent decrees themselves "are not entitlements," *John B. v. Emkes*, 710 F.3d 394, 398 (6th Cir. 2013), neither do they bring a perpetual entitlement to fees. For the reasons stated above, People First did not prove its entitlement to the additional fees awarded here.

The district court's September 10, 2012 order with respect to People First's 19th application for an award of fees is reversed, and the case remanded with instructions to deny that application. Given our disposition of Tennessee's appeal (No. 12-6258), People First's cross-appeal (No. 12-6341) is dismissed as moot.