Lucille YOUNG, et al.,

v.

Samuel PIERCE, Jr., Secretary of the Department of Housing and Urban Development, et al.

Civ. A. No. P-80-8-CA.

United States District Court, E.D. Texas, Paris Division.

July 3, 1986.

Elizabeth Julian, Michael Daniel, Dallas, Tex., for plaintiffs.

Jonathan Strong, HUD, Washington, D.C., Charlene Berry, HUD, Fort Worth, Tex., Steven M. Mason, Asst. U.S. Atty., William J. Cornelius, Tyler, Tex., Robert Wolff, Dept. of Justice, Washington, D.C., Francis E. McGovern, Special Master, Birmingham, Ala., for defendants.

## ORDER

JUSTICE, Chief Judge.

An order granting the plaintiffs' motion for summary judgment on the issue of liability in this civil action was issued on July 31, 1985. *Young v. Pierce,* 628

F.Supp. 1037 (E.D.Tex.1985). That order held that the Department of Housing and Urban Development and its officials ("HUD") knowingly created, promoted, and funded racially segregated housing in thirty-six counties in East Texas in violation of the Fifth Amendment of the United States Constitution and federal statutes. Without conceding the correctness of the finding of liability, the defendants submitted a proposed remedial plan. The court then proposed the appointment of a special master to monitor the desegregation of HUD-assisted housing in East Texas and to supervise discovery during the remedial phase of this litigation. At hearings held on May 5 and May 23, 1986, on the proposed appointment of Francis E. McGovern as the special master, the plaintiffs supported and the defendants opposed the referral to a master. The parties' comments, objections, and amendments to the proposed order of reference have been considered at length in a memorandum opinion filed this day. For the reasons outlined in that opinion, Francis E. McGovern, Esquire, will be appointed to serve as special master to monitor and report on HUD's desegregation efforts, to study the operation of the publicly funded housing programs in East Texas, and to recommend further action that might be taken as part of a comprehensive remedial decree.

## I.

The person designated as special master has served in the same capacity in other complex litigation. *See Jenkins v. Raymark Industries, Inc.,* 109 F.R.D. 269 (E.D.Tex.1985) (order appointing McGovern to prepare a report that compares the characteristics of claims of class representatives and class members in asbestos litigation); *Wilhoite v. Olin,* CV83–C–5021–NE (N.D.Ala. August 10, 1983) (order appointing McGovern in action seeking damages for and removal of DDT and other contaminants); *In re Ohio Asbestos Litigation,* OAL Order No. 3 (N.D.Ohio July 14, 1983) (order appointing McGovern to propose a plan for the management of pretrial discovery and trial proceedings); *United States v. Michigan,* M26–73CA (W.D.Mich. 1983) (order appointing McGovern in action involving Indian treaty). Although he has not previously served as a master in a desegregation case, his lack of civil rights experience is not a disadvantage, since it indicates his neutrality. Moreover, McGovern has experience organizing large amounts of information and working with both plaintiffs and defendants to develop a consensual approach to difficult problems. Counsel for both parties have met with him and reviewed his qualifications. Despite HUD's objections to the appointment of any master, both parties agree that McGovern is capable and qualified to serve in the role of special master.

## II.

The special master shall have three primary responsibilities in this action:

1. to monitor the remedial efforts undertaken by HUD to comply with the order enjoining it from engaging in any conduct that has the purpose or effect of fostering racial segregation and directing it to dismantle the dual system of publicly funded housing in East Texas;

2. to study the operation of the local public housing authorities, rent supplement programs, and section eight housing programs in the thirty-six class action counties, in order to assist the court in evaluating HUD's desegregation efforts and in determining additional ways to facilitate racial desegregation in HUD-assisted housing; and

3. to report to the court on the results of HUD's remedial efforts and recommend further action, if any, that might be taken as part of an appropriate remedial decree, including a definition of substantial compliance.

To assist the special master in carrying out his responsibilities, he shall have all of the rights and powers provided under Federal Rule of Civil Procedure 53.

a. The master shall have complete and unrestricted access to the records of HUD, including statistical data, contracts, re-

ports, correspondence, plans, advertisements, notices, compliance reviews, and other relevant documents. Within ten days of entry of this order, HUD shall designate an official to serve as a liason between the master and the agency. The liason official will act to facilitate the master's ability to obtain information from the agency.

b. The master shall have plenary authority to interview, at reasonable times and places, persons, including employees and staff of HUD, whom he believes will have information that will assist him in performing his duties. HUD will use its best efforts to encourage the local public housing authorities and other providers of federally funded housing to cooperate fully with the special master.

c. The special master shall have the right to hire assistants as he deems necessary, subject to the approval of the court, and his authority, as outlined in this order, will extend to any other individual whom he designates. He may also seek the assistance of court-appointed experts, whose costs may be assessed against one or both parties.

d. The special master may confer with the parties or their attorneys in ex parte communications, as required to fulfill his duties.

e. In order to prevent duplication of efforts, the master shall receive, if he so desires, all of the requests for and responses to discovery during the remedial phase of this litigation. Each party is directed to supply the master with the requests it has made or will make or the responses it has given or will give.

f. Nothing in this order of reference should be construed to limit, modify, or otherwise interfere with HUD's existing authority to investigate, monitor, or enforce compliance with respect to the plaintiffs' claims of unlawful discrimination.

The master is directed to file periodic reports every three months with the court, with copies to the parties. The reports should describe the monitoring activities in which he has engaged, the results of the monitoring, further interim relief that he believes is warranted, and other matters that he deems appropriate for the remedial phase of this litigation. If any interim report makes a recommendation, the parties shall have ten days from the date of service to object to the recommendations and to request a hearing.

A final report is due by October 1, 1987. To the extent that the master recommends additional action as part of an appropriate remedial decree, the report should state the bases for his recommendations, including any facts and opinions on which he relied. The clearly erroneous rule under Rule 53(e)(2) will apply only to those findings and conclusions of the master that are based on hearings conducted on the record after proper notice. After the filing of the final report, each party will have thirty days in which to object to it or any of its provisions, to request a hearing, or to propose an alternative remedial plan. The hearings on any objections will include the right to present evidence and to cross-examine adverse witnesses. The court retains the authority to reject or modify any recommendation by the master, regardless of whether any party has filed an objection.

### III.

The costs and expenses of the special master shall be borne equally by the plaintiffs and defendants. Within thirty days of service of this order, HUD shall deposit $12,500.00 with the Clerk of the Court and the plaintiffs shall deposit $12,500.00 with the Clerk, as interim payments for the master's services and expenses. If the plaintiffs for good cause need more time to obtain their share of the expenses, they may move for an extension.

The special master will be compensated for his services at the rate of $100.00 per hour, and will be reimbursed for the necessary expenses he may incur during the performance of his duties. The master should submit quarterly a voucher of his expenses as the basis for entry of orders directing payment to him. The vouchers should list the hours expended and describe

the work performed. The parties shall have ten days from the date of service to respond to the voucher or raise any objections. Accordingly, it is

ORDERED that Francis E. McGovern, Esquire, shall be, and he is hereby, APPOINTED special master in this action. It is further

ORDERED that both the plaintiffs and the defendants shall, within thirty days of service of this order, deposit the sum of $12,500.00 with the Clerk of the Court.

## INJUNCTION

An order entered in this civil action on July 31, 1985, held that the United States Department of Housing and Urban Development and its officials ("HUD") knowingly created, promoted, and funded racially segregated housing in East Texas in violation of the United States Constitution and federal laws. *Young v. Pierce*, 628 F.Supp. 1037 (E.D.Tex.1985). A memorandum opinion filed on this date explains why HUD's proposed remedial plan is inadequate to remedy the constitutional and statutory violations that were found. Memorandum Opinion at 9–11. Yet, some form of interim relief is necessary, because HUD continues to dispute its liability and refuses to undertake further voluntary efforts to desegregate.

Based on the findings and conclusions in the July 31, 1985, order granting summary judgment to the plaintiffs on the issue of liability, the defendant Department of Housing and Urban Development, its officers, agents, servants, employees, successors, and all persons in active concert or participation with them, shall be, and they are hereby, permanently enjoined in the thirty-six class action counties from:

1. engaging in any conduct having the purpose or effect of creating, promoting, or funding racial segregation in HUD-assisted housing;

2. discriminating against any person or group of persons on account of their race, color, or national origin in connection with their participation in or receipt of benefits for any housing program or activity receiving federal financial assistance;

3. refusing or neglecting to begin immediately to dismantle the dual system of housing segregation that exists in publicly funded housing and to exercise their affirmative duties to provide fair housing; and

4. enforcing federal regulations, providing technical assistance, making federal funds available, or adopting, approving, or using tenant selection and assignment plans or policies in ways that have the purpose or effect of fostering racial segregation.

## MEMORANDUM OPINION

A previous order in this civil action held that the Department of Housing and Urban Development and its officials ("HUD") knowingly created, promoted, and funded racially segregated housing in thirty-six counties in East Texas in violation of the Fifth Amendment of the United States Constitution, the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; and Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3608(d).[1] *Young v. Pierce*, 628 F.Supp. 1037 (E.D.Tex.1985).

1. The Fifth Amendment states: "No person shall be ... deprived of life, liberty, or property, without due process of law." The Civil Rights Act of 1866 gives "[a]ll persons within the jurisdiction of the United States ... the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens," 42 U.S.C. § 1981, and "[a]ll citizens of the United States ... the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal proper-

ty." 42 U.S.C. § 1982. The Civil Rights Act of 1964 prohibits discrimination in programs receiving federal financial assistance, 42 U.S.C. § 2000d, and the Civil Rights Act of 1968 forbids discrimination in housing. The 1968 Act, also known as the Fair Housing Act, places positive duties on the Secretary of HUD to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this title." 42 U.S.C. § 3608(e)(5).

The order granted the plaintiffs' motion for summary judgment on the issue of liability, but did not address the question of a remedy.

The plaintiffs then sought two avenues of relief: they moved for injunctive relief in the form of an order requiring HUD to submit a remedial plan to correct its constitutional and statutory violations and they requested that a schedule be set for proceedings on the remedy. In response to the motion for injunctive relief, HUD filed a proposed remedial plan which outlined remedies for the public housing authorities and multifamily HUD-assisted housing units in the thirty-six class action counties. In reaction to the request for a schedule on remedial proceedings, the court notified the parties that it was contemplating the appointment of Francis E. McGovern as special master during the remedial phase of the litigation. After an order of reference delineating the powers, responsibilities, and costs of the master was proposed on April 14, 1986, two hearings were held to consider the parties' objections. The parties were urged at the first hearing to attempt to agree on the terms of an order, but they announced at the second hearing that their negotiations were stymied. Based on the assumption that a master would be appointed, both sides have submitted their preferred version of an order of reference and their objections to the order propounded by the opposing party.

The plaintiffs support both the referral of the remedial stage to a special master and the appointment of McGovern as the master. Plaintiffs' Objections to HUD's Proposed Order of Reference to a Master 1. They primarily oppose the defendants' demand that the order of reference adopt HUD's proposed remedial plan as the sole interim relief until October 1987. *See id.* at 1–2. They argue that the plan is inadequate and that the issue of interim relief should not be injected into the separate question of the appointment of a master. Plaintiffs' Response to HUD's May 29 Plan Regarding Appointment of a Master and Interim Relief 1–2 (hereinafter cited as Plaintiffs' Response). In addition, they re-sist the efforts of HUD to restrict their right to seek further interim relief before October 1987. *Id.* at 2. The plaintiffs seek the rejection of HUD's proposed order of reference and the scheduling of proceedings on the remedy, Plaintiffs' Objections to HUD's Proposed Remedial Plan 4, and suggest that the special master address the issue of appropriate interim relief as his first item of business. Plaintiffs' Response at 2.

The defendants object to the appointment of a special master on the grounds that no exceptional circumstances exist, as required by the Federal Rules of Civil Procedure, and that the proposed powers and responsibilities of the master permit him to act as a substitute for an article III judge. Defendants' Memorandum Raising Objections to the Proposed Order of Reference 2 (hereinafter cited as Defendants' Memorandum). HUD contends that the proposed order of reference must be revised to require the implementation of its remedial plan, or leave the master with nothing to monitor. *Id.* at 7. More specifically, HUD criticizes the order for granting broad discovery and investigatory powers to the master, failing to limit the number of assistants and their compensation, enabling duplication of discovery by the plaintiffs and the master, and imposing the costs and expenses of the master on the federal government without express Congressional authorization. *Id.* at 2–3. It submits many amendments to accommodate its objections and advises in its latest filing that the parties have agreed on all provisions of an order, except for the role of HUD's proposed remedial plan, which it recommends should be referred to the special master for consideration. Defendants' Memorandum in Response to Plaintiffs' Objections to HUD's Proposed Order of Reference to a Master and in Response to Plaintiffs' Objections to HUD's Proposed Remedial Plan 1 (hereinafter cited as Defendants' Response Memorandum). Without waiving its right to challenge the appointment of any master, *id.* at 2 n. 1, HUD states that, if a master were appointed, it would ap-

prove the selection of McGovern as a person capable and qualified to serve in the role. Defendants' First Proposed Order of Reference 4 (May 5, 1986).

## I. *HUD's Proposed Remedial Plan*

 The court's proposed order of reference of April 14, 1986, did not address directly the issue of interim relief. The order envisioned that HUD would implement voluntarily its proposed remedial plan or, at a minimum, initiate efforts to dismantle the racially segregated housing system in East Texas without further court orders.[2] This assumption was based on representations by HUD during the course of this litigation. A recurrent theme in HUD's defense has been that its continuing efforts to remedy prior unlawful discrimination negate any need for judicial intervention.[3] It reiterated that theme last December in its proposed remedial plan, devoting nearly half of the narrative to a description of its prior endeavors to eliminate the segregation in public housing authorities that it had found in noncompliance with Title VI of the 1964 Civil Rights Act. *See* Defendants' Proposed Remedial Plan 2–9. As a result of HUD's representations, the proposed order directed the master to monitor the remedial efforts of HUD as outlined in its proposed remedial plan and other documents on record. In addition, the master was instructed to file periodic reports on the results of HUD's remedial efforts, study the operation of public housing in East Texas, and recommend further appropriate remedial action. Proposed Order of Reference at 5. It was anticipated, therefore, that the interim relief would consist of any voluntary efforts of HUD to desegregate, supplemented by further relief that the court would order based on the master's recommendations.

Yet, after the appointment of a special master was proposed, HUD changed its position. The agency now declares that it has not agreed to implement its remedial plan voluntarily and that it must be ordered to implement the plan, or the master will have nothing to monitor. Defendants' Memorandum at 27. HUD has not moved for the separate adoption of its remedial plan, but seeks to incorporate the plan into the order of reference as the only interim relief until October 1987. It maintains that its plan presents the appropriate relief, although it does not concede that liability exists. May 23, 1986 Hearing.[4]

**2.** While the court assumed that HUD would implement its plan without any explicit order, HUD anticipated that the court would direct HUD to carry out its plan. At the second hearing, HUD's attorney contended that the agency's position was not inconsistant with the court's proposed order of reference.

> The original order that the court issued we read as envisioning that HUD would implement the remedial plan and, following the master's recommendations, the court would review the record to consider whether additional remedies would be necessary. Under that assumption, we filed our initial proposed order which had the court directing HUD to implement that plan and then referring the matter to the special master.

Second Hearing on Proposed Appointment of a Special Master (May 23, 1986) (hereinafter cited as May 23, 1986 Hearing).

**3.** In a brief submitted in October 1984, for example, the defendants stated:

> HUD has gone through painstaking efforts to develop a comprehensive yet individualized approach to remedying the problem of unlawful segregation in federally-assisted housing in East Texas. Under this program, the local housing providers initially provide a proposed plan for remedying the problem at their projects. HUD then reviews these plans, suggests appropriate modifications and monitors the results. If these plans do not succeed in particular instances, other measures will be taken.

> * * * * * *

> ... In view of this record of HUD's actions, plaintiffs' assertion of necessity for judicial intervention is unfounded.

Defendants' Reply Memorandum in Support of Their Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Partial Summary Judgment 35, 38 (citations omitted) (hereinafter cited as Defendants' Reply Memorandum); *see also id.* at 1–8, 16–17, 34–38 (detailing HUD's efforts to eliminate discrimination); *Young v. Pierce,* 628 F.Supp. 1037, 1051–52 (E.D. Tex.1985) (describing HUD's efforts to eradicate the segregation found in the class action counties since the plaintiffs' filing of their complaint in 1979).

**4.** In its latest memorandum, HUD suggests that the issue of its proposed remedial plan should be referred to the special master for resolution. Defendants' Response Memorandum at 1. *But*

Since HUD refuses to desegregate further without direction from the court, the agency is correct that some sort of interim relief must be ordered. Otherwise, black and white residents of the thirty-six class action counties would have to wait another fifteen months before they began to receive the benefits of integrated housing. But the government errs in insisting that the court intended to adopt HUD's proposed remedial plan as interim relief in this action. Instead, the court had hoped to avoid ruling on the merits of HUD's plan until a master could be appointed and become familiar with housing conditions in the class action counties. The delay would have enabled the court to benefit from the master's knowledge before any decision had to be made on the adequacy of the remedial plan. HUD's demand that its plan be endorsed as immediate relief forces this court to consider now whether the plan should be accepted as the sole remedy until October 1987, when HUD anticipates that it will complete implementation of the plan.

Despite the defendants' proffer, their proposed remedial plan will not be approved as the interim relief in this action. First, HUD does not provide enough information for this court to fulfill its obligation to assess the plan's effectiveness in achieving desegregation. The plan, for example, contains no reference to the twenty-six public housing authorities that HUD has previously found in substantial compliance

with Title VI or the criteria used to determine their compliance. The plan does identify the four factors that HUD considered in determining whether the thirty-six authorities previously found in noncompliance are now in compliance with Title VI, but three of the four criteria are subjective and vague, at best, and the fourth factor is left undefined.[5] The statistics compiled on those thirty-six authorities are incomplete. They do not compare the racial composition of the residents eligible for or in need of public housing in that area with the percentage of black and white occupants or applicants. *See* Supplemental Declaration of John J. Knapp, Exhibit A. Nor does the plan provide any data on the multifamily non-public housing programs. *See* Defendants' Proposed Remedial Plan at 17–19.

Second, a cursory examination of the information provided in the plan indicates that HUD's proposed endeavors are inadequate to eliminate the dual system of racially segregated housing. Nearly two decades after the Supreme Court held that a freedom of choice plan is unacceptable when there are other reasonable ways to convert to a unitary, nonracial school system, *see Green v. County School Board,* 391 U.S. 430, 441, 88 S.Ct. 1689, 1696, 20 L.Ed.2d 716 (1968), HUD relies on a change in public perception as the basis for determining that an authority has eliminated racially identifiable housing units.[6] The

---

*see* Defendants' Memorandum at 6 (objecting to the proposed role of the special master because his reports and recommendations would have to be reviewed by the court in substantial detail). Because of the inadequacies of the plan, there appears to be no reason to require the master to hold hearings on it as interim relief. Instead, the master can evaluate the plan as part of his investigation of possible remedies.

**5.** The four factors are:

1. Evidence of acceptance by applicants of units in projects or sites where tenants of their race had not resided previously.

2. The attitude of the housing authority and its executive director in developing and implementing appropriate steps to assure that housing would be made available on [a] nondiscriminatory basis.

3. Indications that the housing authority had examined additional actions to remedy the ef-

fects of prior discrimination and had implemented the actions appropriate to local circumstances.

4. The effectiveness of the housing authority in the implementation of actions identified. Defendants' Proposed Remedial Plan at 5–6.

**6.** Of the thirty-six public housing authorities that had previously been in noncompliance with Title VI, HUD found that seventeen had taken sufficient action to achieve substantial compliance. HUD based its finding of substantial compliance

on a determination that the housing authority had removed all barriers to open access at its previously unlawfully segregated projects. Thus, the determination of compliance was not made based on any fixed numerical racial occupancy ratios, but on evidence that the decision of applicants to accept or reject housing at particular projects or sites would not be

freedom of choice plans adopted by local housing authorities after passage of the 1964 Civil Rights Act had no significant impact in desegregating projects. *Young v. Pierce,* 628 F.Supp. 1037, 1045 (E.D.Tex. 1985). There is no reason to believe that the same policy will generate any more success twenty years later. Not only does HUD depend on changes in attitude—rather than changes in residence—to measure desegregation, but it also adopts a uniform approach to all of the housing projects. With a poverty population among blacks that ranges from six percent in Franklin County to sixty-five percent in Harrison County, HUD's plan fails to consider the diversity of conditions that exists in the class action counties.[7] The plan also neglects to address HUD's refusal to fund projects in areas of minority concentration or to pledge enforcement of its own affirmative marketing regulations, despite the court's finding that HUD encouraged discrimination in section 8 housing by carrying out those two policies in a racially conscious manner. *Young,* 628 F.Supp. at 1053–54. In addition, HUD's proposal in the key area of tenant transfers is to limit transfers—which it insists must be funded by the local authority and not HUD—to the movement of "inappropriately housed tenants to appropriately sized units"[8] or "voluntary integrative transfers" which do not take precedent over other valid transfers. Defendants' Proposed Remedial Plan at 11, 13–14. A plan may form the basis for an order of interim relief if it promises to remedy the constitutional violations, but HUD's remedial plan fails to meet that standard.

Third, the plan has not been subjected to the adversarial process, as indicated by the plaintiffs' criticisms. They contend that the plan allows racially identifiable projects to continue to exist, omits any reference to equitable sharing of desegregation by whites and minorities, fails to address desegregation in section 8 projects, ignores the disparate conditions of the white and black projects, and relies on a "one offer tenant selection plan" that has not desegregated housing projects in other locations. *See* Plaintiffs' Objections to HUD's Plan at 2–4. It would be unfair to adopt the plan, particularly as the sole remedy for fifteen months, without providing the plaintiffs a full opportunity to suggest other relief.

Rather than adopting HUD's flawed plan as interim relief in this action, a more general grant of relief will be made. HUD will be enjoined from committing further constitutional violations and directed to begin immediately to dismantle the system of racial segregation that exists in publicly funded housing in East Texas. HUD can no longer refuse to desegregate, because it will not be under court order to initiate remedial efforts. To monitor the effectiveness of its actions, a special master will be appointed.

II. *Appointment of a Special Master*

■ The appointment of a master is opposed by HUD on the grounds that neither complexity nor the existence of multiple claims justifies a reference and that the proposed master will function as a substitute for an article III judge in violation of a new Justice Department policy. Defendants' Memorandum at 3–6. HUD further argues that sovereign immunity prevents the agency from paying for the cost of a

---

based on the perception that such housing was intended or maintained for occupancy by persons of a particular race.
Defendants' Proposed Remedial Plan at 6. The Supreme Court in *Green,* however, noted that the fact that a school board in 1965 opened the doors of the former white school to black children and the doors of the black school to white children merely began, not ended, the inquiry whether the board had taken adequate steps to abolish the segregated system. *Green v. County School Board,* 391 U.S. at 437, 88 S.Ct. at 1693.

Yet, HUD has committed itself only to the beginning of the inquiry in this action.

**7.** For a discussion of HUD's argument that an individual approach for each county or housing unit is not needed, see *infra* pp. 16–18.

**8.** This remedy is merely a reiteration of HUD's Phase I plan that was carried out prior to the submission of the proposed remedial plan. *See Young,* 628 F.Supp. at 1051–52; Defendants' Proposed Remedial Plan at 3.

master, unless it voluntarily agrees to waive its immunity. *Id.* at 11–14. It refuses to pay any costs or expenses unless its revisions are adopted in the final order of reference. *See* May 23, 1986 Hearing; *see also* Defendants' Notice of Filing 1 (May 23, 1986) ("The attached order is being filed with the understanding that if the Court decides to appoint a special master, the revisions to the Court's proposed order reflected in the attached order are necessary.").

### A. Requirement of Exceptional Conditions

Rule 53 provides for the appointment and compensation of masters in extraordinary circumstances. "A reference to a master shall be the exception and not the rule.... [I]n actions to be tried without a jury, ... a reference shall be made only upon a showing that some exceptional condition requires it." FED.R.CIV.P. 53(b).

The Court of Appeals for the Fifth Circuit has interpreted the requirement of an "exceptional condition" to encompass both evidence of noncompliance with a court order two years after its entry and the need for daily supervision of the relationship between two state agencies. *Gary W. v. Louisiana,* 601 F.2d 240, 244 (5th Cir.1979). In a later action, the Fifth Circuit found that a court was not required to wait for noncompliance before appointing a master to implement a decree. *Ruiz v. Estelle,* 679 F.2d 1115, 1161 (5th Cir.), *modified on other grounds,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). Instead, the court held that the appointment of a master to supervise implementation of an order involving the Texas prison system was justified when there was a comprehensive plan for the elimination of unconstitutional conditions, a record of intransigence by the defendant, a strained working relationship between attorneys for the plaintiffs and defendants, a refusal by the defendants to acknowledge completely evident violations of the Constitution, and a failure of the prison system to conform its practices to its written policies and procedures. *Id.* at 1160; *see also Newman v. Alabama,* 559 F.2d 283, 289 (5th Cir.1977) (" '[R]eviewing plans for implementation of this decree to ensure that they comport with minimum standards set forth' could more properly have been assigned to a magistrate or to a master, qualified to hold hearings, make findings of fact, and report to the Court for its approval or disapproval."), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). Although the Fifth Circuit has not addressed the meaning of exceptional conditions in the context of a proposed appointment after a finding of a constitutional violation but before the issuance of a remedial decree, it has noted that Rule 53 is concerned primarily with the use of a master to gather facts prior to a remedial decree or as an expert to recommend relief after a finding of liability. *Ruiz,* 679 F.2d at 1160 n. 234.

The advisory committee note explains that an outside master may be appropriate under Rule 53, when special expertise is desired or lengthy and detailed supervision of a case is required. *See* FED.R.CIV.P. 53 advisory committee note. In this action both circumstances exist. Because the case law on housing discrimination provides little guidance on what HUD must do to establish a unitary system of housing or what a federal court may order, the assistance of persons outside the court system is needed to fashion an appropriate remedy.[9]

---

9. The purpose of the appointment is not to seek an advisor on what is a constitutionally permissible remedy, since that is a legal issue best handled by the court. *See Reed v. Cleveland Board of Education,* 607 F.2d 737, 747 (6th Cir. 1979). Rather, a master is needed as a neutral observer to gather facts and to propose a practical solution to a difficult problem. As one special master in a similar situation explained the advantages of his role:

> The court-appointed "specialist," acting without the constraint of formal hearings, offers at least two advantages over the fact-finder sitting in the courtroom. First, complex fact-gathering occurs more economically (and perhaps more thoroughly) when the fact-finder is himself able to initiate the questions, to obtain whatever records and documents he deems potentially relevant rather than react-

The only Supreme Court decision concerning remedies in a comparable housing discrimination case dealt with the authority of a federal court to order HUD to take remedial action outside the city limits of Chicago. *Hills v. Gautreaux*, 425 U.S. 284, 286, 96 S.Ct. 1538, 1541, 47 L.Ed.2d 792 (1976). Although the Court found that a metropolitan area remedy was permissible, that holding does not help define possible ways to desegregate housing in the small towns and cities of East Texas. *Cf. Swann •v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 14, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971) (noting that rural areas accustomed to consolidated school systems implemented by bus transportation could adjust more readily to their constitutional obligations than metropolitan areas with numerous schools, congested traffic, and dense populations). Other reported decisions on housing desegregation involve a single city or housing authority. *See, e.g., Clients' Council v. Pierce*, 711 F.2d 1406 (8th Cir.1983) (finding HUD liable under the Fifth Amendment and Title VIII for failure to promote fair housing in Texarkana, Arkansas); *United States v. City of Parma*, 661 F.2d 562 (6th Cir.1981) (finding that the largest suburb of Cleveland violated Title VIII of the 1968 Civil Rights Act), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982). In contrast, this action involves residents of thirty-six counties with different demographic characteristics and housing needs, and, by the defendants' count, 177 autonomous projects operated by for-profit companies, non-profit organizations, and local government authorities.

Besides the lack of precedent on remedies, the variations in the housing programs, housing providers, and localities suggest that a remedy may need to be tailored to each public housing authority or housing project based on its peculiar facts.[10] HUD disagrees that individual approaches are appropriate or permitted by the Constitution, arguing that the court should wait until the agency has completed implementation of its remedial plan in October 1987 before concluding that separate remedies are needed. *See* Defendants' Memorandum at 5, 15–16. Yet, their own plan divides the local housing authorities into three categories, depending on the level of compliance with agency regulations, and evaluates the actions of each noncomplying authority according to the local circumstances. Defendants' Proposed Remedial Plan at 5–6. Moreover, Samuel Pierce, Jr., the Secretary of HUD, acknowledged the need for independent treatment of each

ing to whatever the parties choose to submit, to discuss these materials with informed persons, and to move freely between the parties who, outside the courtroom, are themselves more relaxed and forthcoming. ...

The second advantage flows directly from the first: the affected community is involved legislatively in the search for the remedy. ... To impose systemic change, without itself becoming a legislative forum, the court should have access to whatever facts and opinions may help it to mold the remedial decree. C. Berger, *Away From the Court House and Into the Fields: The Odyssey of a Special Master*, 78 Colum.L.Rev. 707, 737–38 (1978).

**10.** HUD relies on the Supreme Court's decision in *La Buy v. Howes Leather Co.*, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957), to argue that complexity and length of time are not exceptional circumstances that merit a referral to a master. At least one commentator contends that the Rule 53 requirement of exceptional conditions, as interpreted in *La Buy*, does not apply to the use of special masters in institutional reform cases. " 'The policy considerations that support *La Buy's* interpretation of rule 53 are absent when resort is had to expert masters after the violations of the defendant institution have been determined.' " *Ruiz v. Estelle*, 679 F.2d 1115, 1160 n. 235 (5th Cir.) (quoting Special Project, *The Remedial Process in Institutional Reform Litigation*, 78 Colum.L.Rev. 784, 807 (1978)), *modified on other grounds*, 688 F.2d 266 (5th Cir.1982), *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983); *see also Armstrong v. O'Connell*, 416 F.Supp. 1325, 1338 (E.D. Wis.1976) (special master assigned to develop a school desegregation plan functions as something other than a traditional Rule 53 master, since he is asked to report on the question of a remedy rather than make findings of fact), *vacated and remanded*, 566 F.2d 1175 (7th Cir. 1977). Assuming *La Buy* does apply, the referral of this action to a special master is consistent with the *La Buy* decision, because the appointment is not based solely or even primarily on the complexity of the facts. *See Ruiz*, 679 F.2d at 1160.

public housing authority in a 1984 memorandum to the regional administrator.

As the lessons of the school desegregation experience as well as the variety of local circumstances in the public housing system must make clear, there is no universal answer either to what the racial or other demographic characteristics of a nondiscriminatory public housing system will be or the means by which the transition will be achieved. It is because of the variety of local circumstances as well as the statutory structure of the public housing system that initial, primary and inescapable responsibility must rest on the local authority. The Department's response to authority proposals must be equally informed and sensitive to local circumstances as well as to the individual rights of tenants and applicants and the statutory objectives of the public housing program.

Defendants' Reply Memorandum, Declaration of John J. Knapp, Exhibit A. The school desegregation cases, if not Secretary Pierce's memorandum, belie HUD's protestations against individual remedies. *See Milliken v. Bradley,* 433 U.S. 267, 287, 97 S.Ct. 2749, 2760, 53 L.Ed.2d 745 (1977) (decree ordered is not a blueprint for other cases since no one plan will do the job in every school desegregation case); *Brown v. Board of Education,* 349 U.S. 294, 299, 75 S.Ct. 753, 755, 99 L.Ed. 1083 (1955) (remanding cases to the district courts because of their proximity to local conditions and the possible need for further hearings). Therefore, an investigation of conditions in each county and at each housing unit is needed before special relief can be ordered based on the local circumstances.

Not only is special expertise needed to monitor HUD's remedial efforts and propose additional relief, but also the facts in

this action indicate that the second factor identified by the advisory committee—detailed and perhaps lengthy oversight—is present. In their remedial plan, the defendants propose the submission of quarterly reports for at least two years by local noncomplying housing authorities; the agency also pledges to carry out occupancy audits, management reviews, and possibly compliance reviews of the authorities previously found in compliance, and to conduct compliance meetings, record reviews, and possibly compliance reviews of HUD-assisted multifamily housing. Defendants' Proposed Remedial Plan at 9, 10, 16–18. Even if HUD were to choose not to require compliance reports or to implement the audits and reviews, some other reporting and monitoring system would still be needed. Where there will be a great deal of information that must be processed for the use of the court, Rule 53 provides authority for the appointment of a special master.[11] *Cf. Ex Parte Peterson,* 253 U.S. 300, 313, 40 S.Ct. 543, 547, 64 L.Ed. 919 (1920) (where documents and other evidence are voluminous, the better practice is for a court to use its equitable powers to refer the matter to a master).

In addition, the experience gained in implementing a tenant transfer plan in a companion case further recommends the appointment of a special master to devise a desegregation plan and, if necessary, supervise its implementation. In *Young v. Whiteman,* P–82–37–CA (E.D.Tex. October 11, 1983), the case severed from this action in 1982, this court found that the Clarksville Housing Authority intentionally assigned tenants by race for the purpose of segregating them. The authority was given five days to submit a tenant transfer plan that insured that each site would be

---

11. One housing discrimination case in which the appellate court reversed the appointment of a master is distinguishable on its facts. In that case, the district court adopted the recommendations of the plaintiff's expert witness that the defendant should be given the first opportunity to correct the discrimination, but at the same time appointed a master to oversee implementation of the court's order. *United States v. City of Parma,* 504 F.Supp. 913 (N.D.Ohio 1980). The Court of Appeals for the Sixth Circuit reversed, finding that the imposition of a master was antithetical to the recommendations of the expert witness. *United States v. City of Parma,* 661 F.2d 562, 578 (6th Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982).

within five percent of the existing racial composition of the authority's tenant population. Findings of Fact, Conclusions of Law and Preliminary Injunction 7. The plan presented by the defendants and approved by the plaintiffs complied with the specifications set out in the preliminary injunction and was accepted without any change. Order of November 30, 1983, at 1. Twenty-five families were moved from the white project to the two black projects, and twenty-four families were shifted from the black projects to the white project over a short period of time during the middle of winter. Despite its compliance with the preliminary injunction, the transfer plan proved ill-timed and exceptionally stringent on the affected parties. In desegregation situations, a master can supply thoughtful consideration and assure planning and good timing to relieve the harshness of necessary remedial steps.

Furthermore, the nature of public law litigation demands that judges or persons they appoint sometimes perform different roles than in traditional cases, particularly in the remedial phase of a school desegregation or institutional reform case. *Reed v. Cleveland Board of Education,* 607 F.2d 737, 743 (6th Cir.1979). Although the court could hold an evidentiary hearing at which the parties could present the facts on housing in East Texas, a master can better gather the necessary information. In addition to hearing evidence at formal proceedings, a master can visit the sites, talk with residents and members of the community, confer with experts and the parties, and informally resolve many problems associated with desegregation.[12] As one court that appointed a special master to develop a desegregation plan stated: "The coordination of scores of agencies, officials, and private persons and groups in developing a workable plan will require patient and understanding consultation. The role of coordinator is not one suited to a court which can best preside at an adversary hearing devoted to a specific plan." *Hart v. Community School Board,* 383 F.Supp. 699, 762 (E.D.N.Y.1974), *aff'd,* 512 F.2d 37 (2d Cir.1975).[13]

In addition to the authority granted by the federal rules, a federal court has the inherent power to appoint a special master to aid in the performance of specific judicial duties. *Ex Parte Peterson,* 253 U.S. 300, 312, 40 S.Ct. 543, 547, 64 L.Ed.2d 919 (1920); *Ruiz v. Estelle,* 679 F.2d 1115, 1161 (5th Cir.), *modified on other grounds,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). When litigation exposes violations of the Constitution in public institutions, a court of equity must take steps, including the appointment of persons outside the court system, to eliminate the constitutional infirmities. *Reed v. Cleveland Board of Education,* 607 F.2d 737, 743 (7th Cir. 1979). A number of district courts have appointed special masters or experts to prepare a desegregation plan or to develop a remedy after a finding of constitutional violations. *See Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 8, 91 S.Ct. 1267, 1272, 28 L.Ed.2d 554 (1971); *Reed,* 607 F.2d at 741; *Morgan v. Kerrigan,* 530 F.2d 401, 425 (1st Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2648, 49

---

**12.** *See supra* note 9. Moreover, a special master "[a]ble to move far afield free to enlist the services of interested, but neutral specialists, ... can draw upon community resources that will help promote a more satisfying, acceptable outcome." C. Berger, *supra* note 9, at 728.

**13.** *See also New York State Association for Retarded Children v. Carey,* 706 F.2d 956, 963 (2d Cir.) (monitoring of a consent judgment that mandates individualized care for thousands of mentally retarded persons and entails balancing of the interests of the parties, school authorities, employees, and community groups is a polycentric problem that cannot be resolved easily

through the traditional adjudicative process), *cert. denied,* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983); Special Project, *The Remedial Process in Institutional Reform Litigation,* 78 Colum L.Rev. 784, 790 (1978) ("[T]he resolution of the special problems of insufficiently expert judges and lack of cooperation from defendants generally requires an approach to remedy formulation that includes extensive multiparticipant involvement and delegates to a court-appointed officer, when necessary, the task of providing impartial expert guidance and assistance.").

L.Ed.2d 386 (1976); *Andrews v. City of Monroe,* 513 F.Supp. 375, 407 (W.D.La. 1980), *aff'd sub nom. Taylor v. Ouachita Parish School Board,* 648 F.2d 959 (5th Cir.1981); *Amos v. Board of Directors,* 408 F.Supp. 765, 822–24 (E.D.Wis.), *aff'd sub nom. Armstrong v. Brennan,* 539 F.2d 625 (7th Cir.1976), *vacated on other grounds,* 433 U.S. 672, 97 S.Ct. 2407, 53 L.Ed.2d 1044 (1977); *Gautreaux v. Chicago Housing Authority,* 384 F.Supp. 37, 37–38 (N.D.Ill. 1974), *aff'd sub nom. Chicago Housing Authority v. Austin,* 511 F.2d 82 (7th Cir. 1975); *Hart v. Community School Board,* 383 F.Supp. 699, 767 (E.D.N.Y.1974), *aff'd,* 512 F.2d 37 (2d Cir.1975); *see also Jones v. Milwaukee County,* 441 F.Supp. 455, 458 (E.D.Wis.1977) (when a desegregation plan fails to guarantee full and prompt implementation of a court order, then a district court may appoint a master to recommend a plan and to oversee its implementation). Given the number of desegregation cases in which masters have been appointed to develop remedial plans, the referral in this action is not extraordinary. *See Gary W. v. Louisiana,* 601 F.2d 240, 244–45 (5th Cir.1979) (listing cases).

The inadequacies of HUD's proposed remedial plan, the lack of precedent on remedies in comparable actions, the diversity among the housing units and communities, the need for individual consideration of the different projects, the volumes of information that have been and will be generated, the past experience of this court in ordering the implementation of a desegregation plan that was ill thought out, and the weakness of the adversary system in devising remedies to racial segregation in housing all demonstrate that exceptional conditions exist in this action and that the appointment of a master is within the equitable

powers of this court.[14] For these reasons, a master will be appointed to monitor and report on HUD's remedial efforts, study the operation of the publicly funding housing programs in East Texas, and recommend further action that might be taken as part of a comprehensive remedial decree.

**B. Powers and Responsibilities of the Special Master**

Besides asserting the absence of exceptional circumstances, HUD contends that the role proposed for the master violates constitutional limits on the use of a special master. Defendants' Memorandum at 6. As originally drafted, the order of reference required the master to file a status report every two months, describing his monitoring activities, the results of the monitoring, and any other remedial matters that he deemed appropriate. The order further provided for the submission of a final report to which the parties could object at hearings where they would have the right to present evidence and cross-examine witnesses. "The court retains the authority to reject or modify any recommendation by the master, regardless of whether any party has filed an objection." Proposed Order of Reference at 6.

The language in the proposed order of reference was taken from the Fifth Circuit's opinion in *Gary W. v. Louisiana,* 601 F.2d 240 (5th Cir.1979). In *Gary W.,* the state had argued that the district court abused its discretion by granting more authority to the special master than Rule 53 allowed, but the Fifth Circuit rejected that argument. Because the master's functions were clearly defined, the parties had the right to object to recommendations and participate in hearings on their objections, and the court retained the authority to

14. When the Supreme Court was contemplating the relief to be granted in *Brown v. Board of Education,* it directed the parties to consider among several possible alternatives, the appointment of a master "to hear evidence with a view to recommending specific terms for such decrees." *Brown v. Board of Education,* 347 U.S. 483, 495 n. 13, 74 S.Ct. 686, 692 n. 13, 98 L.Ed. 873 (1954). The parties in the companion case against the District of Columbia were asked to

consider the same alternatives. *Bolling v. Sharpe,* 347 U.S. 497, 500, 74 S.Ct. 693, 694, 98 L.Ed.2d 884 (1954). The Court decided a year later to remand the cases to the district courts, which could best appraise whether the school authorities were implementing the governing constitutional principles. *Brown v. Board of Education,* 349 U.S. 294, 299, 75 S.Ct. 753, 755, 99 L.Ed. 1083 (1955).

reject or modify any recommendation, the power given the master comported with Rule 53. *Id.* at 245; *see also Chicago Housing Authority v. Austin,* 511 F.2d 82, 83–84 (7th Cir.1975) (denying writ of mandamus to vacate order when referral did not constitute abdication of judicial power to make decisions).

To clarify that the plaintiffs and HUD have all of the rights afforded the parties in *Gary W.,* the final order of reference will provide for quarterly reports, which may include the master's advice on interim relief. The parties will have the right to object to recommendations, to present their objections at a hearing, and to propose an alternative remedial plan after submission of the final report. In addition, the proposed order will be altered to make certain that the "clearly erroneous" rule does not apply to the reports, findings, and conclusions of the special master unless they are based on hearings conducted on the record after proper notice. *See Ruiz v. Estelle,* 679 F.2d 1115, 1163 (5th Cir.), *modified on other grounds,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). With those changes, the final order of reference will comply with the standards of Rule 53, as defined by the Fifth Circuit.

HUD does not limit its opposition to general objections on the master's role. Rather, it also criticizes the language that defines the master's powers and responsibilities, specifically the special master's authority to examine witnesses and obtain documents, to hold ex parte communications, and to hire assistants. Defendants' Memorandum at 7–11. HUD offers several restrictive amendments that must be adopted as its price for volunteering to pay half of the costs and expenses of the master.

The investigatory powers outlined in the proposed order of reference provided the master with "plenary authority to interview employees and staff members of HUD, local housing authorities, and other providers of federally funded housing at reasonable times and places." Proposed Order of Reference at 5. In contrast, the defendants' latest version of those powers declares that the master may

> examine persons, including employees and staff members of HUD, whom he believes will have information which will assist him in performing his duties, provided that both parties shall have (1) at least ten days' notice of any such document reviews or witness examinations, (2) the opportunity to be present, if they so desire, and (3) the opportunity at examinations to ask questions, if they so desire. In connection with document reviews or witness examinations, counsel shall be permitted to assert claims of privilege or otherwise object. Both parties are also entitled to have such witness examinations conducted on the record....

Defendants' Third Proposed Order of Reference 7 (May 30, 1986). The defendants' proposed language is unnecessary and impractical. First, employees and staff members of HUD are already protected from all interviews except those conducted "at reasonable times and places." Second, the defendants' provision, if accepted, would severely hinder the activities of the master. A master cannot learn the private attitudes and recommendations of HUD employees when he must be accompanied by an entourage of lawyers and a court reporter, thus transforming a confidential interview into a public examination.

Concerning the review of documents, the proposed order stated that the master would have "complete and unrestricted access to the records of HUD." Proposed Order of Reference at 5. The defendants suggest the substitution of a half-page list of specific documents, Defendants' Second Proposed Order of Reference 6–7 (May 23, 1986), which the plaintiffs attack because a particular report is omitted. Plaintiffs' Objection to HUD's Proposed Order at 3. The defendants counter that, by leaving out any specific reference to a report, they did not intend to imply that it would not be provided. Defendants' Response Memorandum at 2. Yet, the implication of a

specific list of documents is that other reports will not be available. As the parties' disagreement shows, it is difficult to anticipate every document that might prove relevant to the master while he monitors and investigates. Since the court is confident that the master will exercise discretion and good judgment in his requests for reports and other documents, the defendants' list will not be substituted for the generic descriptions in the proposed order of reference.

The agency also argues that specific limitations must be placed on the use of assistants by the special master to ensure that the costs do not become exorbitant and that an army of assistants do not simultaneously swarm on HUD for information. Defendants' Memorandum at 11. Like the defendants' attempt to restrict the investigations of the master by saddling him with a crew of followers, the defendants' proposal to limit the number, salary, and hours of any assistants is impractical and counterproductive.[15] The proposed order of reference already requires the master to obtain the court's approval before hiring any assistants and complies with the "better practice" of setting the master's fee in advance and requiring periodic vouchers.[16] *See Reed v. Cleveland Board of Education*, 607 F.2d 737, 748 (7th Cir.1979). Furthermore, there must be another order, to which the parties can object, before each can be required to pay more than $12,-500.00. The final order of reference will not restrict the number of assistants, but it will retain the requirement that the master

submit his requests for assistants to the court for approval. To provide additional safeguards, the order will clarify that the master must obtain the court's approval before hiring any experts whose expenses will be paid by the parties. In addition, he will be required to present his vouchers at least quarterly and include in them a description of the hours expended and work performed. The parties will then have ten days to raise any objections before payment is ordered.

Two further points raised by HUD require amendments to the proposed order of reference. First, the defendants suggest the designation of a HUD official to act as a liason to facilitate the ability of the master to obtain information from HUD. Second, HUD originally interpreted the order to mean that the master should assume the plaintiffs' traditional role of discovery. Hearing on Proposed Appointment of a Special Master (May 5, 1986). As the parties were informed at the first hearing, the proposed order was drafted with the intention that the parties would conduct discovery and the master would make rulings on disputed requests, functioning in a capacity similar to a magistrate. The defendants then argued that a master was not needed to supervise separate discovery. On reflection, it appears that the defendants are correct. To conserve the master's time and resources, HUD should designate a liason official and the parties should present any discovery disputes to the court for resolution.[17]

---

**15.** By restricting the number of hours that any assistant could work, the defendants are discouraging the use of personnel who would command a considerably lower hourly rate than the special master. Moreover, the proposed special master at one time indicated that there was a strong possibility of outside funding and resources to augment the $25,000 that the parties would initially pay to cover his costs.

**16.** The fee of $100.00 per hour is modest, given the experience of the proposed special master and the $150.00 hourly rate recently awarded the plaintiffs' counsel for their work on the liability phase of this action.

**17.** Although supervision of discovery will be deleted from the assignments given the master in

the final order of reference, the court does endorse one agreement of the parties concerning discovery. Any discovery motion should "have a certificate of counsel that certifies that attempts to resolve the dispute informally have been unsuccessful." Defendants' Third Proposed Order of Reference 6 (May 30, 1986); Plaintiffs' Second Proposed Order of Reference 6 (May 23, 1986); *see also* Local R. (6)(h) ("Any Judge of this Court may refuse to hear a motion relating to pre-trial discovery unless the movant advises the court within the body of the motion that counsel for the parties have first conferred in a good faith attempt to resolve the matter by agreement."). Other agreed aspects of discovery in the orders proposed by the parties, such as HUD's ability to assert "appropriate objections

In sum, the proposed order of reference, as modified, does not extend extraordinary or unconstitutional authority to the special master. Furthermore, its more general definition of the powers and responsibilities of the master is preferred over the defendants' specific provisions, for there is no reason to doom the work of the master before he begins, or to force him to refer to the order of reference before he can conduct an interview or request a document. If problems arise during the operations of the master, the parties have the right to petition the court for changes in the order of reference.

### III. *Financing the Work of the Special Master*

█ The proposed order of reference required HUD to deposit $25,000.00 in the registry of the court to compensate the special master. HUD challenged the court's authority to order any payment, but volunteered to pay half of the expenses associated with the work of the master. Defendants' Memorandum at 13. At the second hearing, the plaintiffs indicated their willingness to assume the other half of the costs of the master. May 23, 1986 Hearing. For that reason, the final order of reference splits the costs of the master equally between the plaintiffs and the defendants. The plaintiffs plan to seek reimbursement of their share of the master's expenses as a recoverable cost. Plaintiffs' Response at 3.

The government, however, contends that no court can order the United States to pay even half of the costs and expenses of a special master. The government's argument is: special masters are a cost of litigation; the United States cannot be ordered to pay a cost without an express waiver of sovereign immunity; Congress has not waived immunity for the compensation of masters; therefore, HUD cannot be ordered to pay in this action. Defendants' Memorandum at 11–12. HUD's reasoning ignores the purpose of the statutes providing for costs against the United States, the exceptions that have developed to sovereign immunity, the waiver expressed in the Administrative Procedures Act, and the remedial powers of courts of equity.

### A. The Recovery of Costs Under §§ 2412 and 1920

Rule 54(d) states that costs against the United States may be imposed "only to the extent permitted by law." FED.R.CIV.P. 54(d). The United States Code provides that "a judgment for costs, as enumerated in section 1920 of this title [28 U.S.C. § 1920], but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity." 28 U.S.C. § 2412(a). The purpose of that section was to correct the disparity of treatment between parties "by putting the private litigant and the United States on an equal footing as regards the award of court costs to the prevailing party in litigation involving the government." S.Rep. No. 1329, 89th Cong.2d Sess., *reprinted in* 1966 U.S.Code Cong. & Ad.News 2527, 2528 (hereinafter cited as Senate Report). The statute thus gives district courts the same discretion to tax costs against the government as against private litigants. 10 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure, § 2672, at 238 (1983). Since a court may tax the costs of a special master against a private party who does not prevail, *Studiengesellschaft Kohle mbH v. Eastman Kodak Co.*, 713 F.2d 128, 134 (5th Cir.1983), the statutory provision should also allow the taxation of similar costs against the United States when it loses. *Cf. James Sherman & Sons, Inc. v. United States*, 267 U.S. 86, 87, 45 S.Ct. 238, 238, 69 L.Ed. 527 (1925) (assessing costs against the United States in an admiralty case when act provided that claims should be heard and determined according to principles and rules governing in similar cases between private parties); *Gary W. v. Louisiana*, 601 F.2d 240, 246 (5th Cir.1979) (upholding the assessment of

to discovery," will be omitted from the final

order of reference as unnecessary.

the special master's fee and expenses against the state government, since federal courts may enter comprehensive orders that have a substantial impact on the state treasury).

Nevertheless, HUD maintains that the compensation of a special master must be explicitly identified in 28 U.S.C. § 1920 to be taxed as a cost against the United States.[18] Defendants' Memorandum at 13. There is some support for its view since Congress has amended § 1920 to make an express reference to court-appointed experts as a taxable cost and has amended 28 U.S.C. § 2412 to provide explicitly for an award of attorney's fees and expenses against the United States. *See* 28 U.S.C.S. §§ 1920(6), 2412(b). Yet, those amendments were necessary because Congress had at one time expressly excluded the taxation of expert witness fees as costs and the award of attorney's fees against the United States.[19] In contrast, Congress has never forbidden the taxation of the fees and expenses of a special master as costs against the United States. Since the recovery of specific costs from the United States is permitted, unless specifically prohibited by statute, *see NAACP v. Civiletti,* 609 F.2d 514, 516 n. 3 (D.C.Cir.1979), *cert. denied,* 447 U.S. 922, 100 S.Ct. 3012, 65 L.Ed.2d 1114 (1980), there has not been a need for a specific amendment to allow the taxation of the costs of a special master. *But see* J. Altman, *Implementing a Civil Rights Injunction: A Case Study of NAACP v. Brennan,* 78 Colum.L.Rev. 739, 751 (1978) (concluding that the financing of a special master, monitor, or ombudsman could be taxed as a cost against the United States only if § 1920 explicitly authorized it).

The government has been ordered to pay the costs of a special master in a variety of circumstances without an express reference in 28 U.S.C. § 1920. In antitrust litigation against the telephone company, for example, the United States contended that it could not be responsible for half of the costs of the special masters appointed to supervise discovery. The district court, however, rejected the argument and ordered the parties to share equally the costs. *United States v. American Telephone and Telegraph Co.,* 461 F.Supp. 1314, 1348 n. 112 (D.D.C.1978). Similarly, the Court of Appeals for the Fourth Circuit assessed half of the fees of a special master in a boundary dispute against the United States because the dispute was of equal importance to both parties. *United States v. Cline,* 388 F.2d 294, 296 (4th Cir.1968); *see also Century Investment Corp. v. United States,* 277 F.2d 247, 254 (2d Cir.1960) (requiring the United States, the prevailing party, to pay all of the fees and expenses of the special master in a condemnation case, because its misconception of the proper measure of damages, and not the defendants' conduct, caused the master's re-

---

**18.** HUD made a similar argument in opposing the award of attorney's fees in *Client's Council v. Pierce,* 778 F.2d 518, 520–21 (8th Cir.1985). In that case, the district court held that the plaintiffs were not entitled to attorney's fees, because they did not prevail under any of the statutes listed in the Civil Rights Attorney's Fee Award Act of 1976, 42 U.S.C. § 1988. The appellate court reversed. "[I]t would be unjust and inconsistent with the modern rules of pleading to deny fees to a plaintiff who originally pleaded but ultimately failed to pursue a statutory claim, but prevailed on an identical constitutional claim." *Id.*

**19.** The legislative history of the 1966 amendment to § 2412, which permitted the taxation of costs against the United States, makes clear that expert witness fees were not to be included as costs. *See* Senate Report at 2529. As originally introduced, the bill explicitly provided that the fees of expert witnesses could not be taxed against the United States. *Id.* at 2531. The House Committee deleted the reference to expert witnesses because the courts did not distinguish between expert and other witnesses in allowing witness fees. *Id.* at 2530. The bill as passed did state that "a judgment for costs, as enumerated in Section 1920 of this title *but not including the fees and expenses of attorneys,* may be awarded to the prevailing party in any civil action brought by or against the United States." 28 U.S.C. § 2412 (emphasis added). The 1980 amendment added several provisions, including one that provided that "a court may award reasonable fees and expenses of attorneys ... to the prevailing party in any civil action brought by or against the United States." 28 U.S.C. § 2412(b).

port to be unusable). If the federal government can be ordered to pay the compensation of a special master before liability is determined, then it seems reasonable and fair to require HUD to pay the fees and expenses of the master after it has been found in violation of the Constitution.[20]

## B. Exceptions to Sovereign Immunity

Even if HUD were correct that § 2412(a) does not waive the government's immunity, sovereign immunity would not bar this court from ordering the United States to pay the fees and expenses of a special master who monitors the interim relief and develops a remedial plan to desegregate public housing. The special master in an institutional reform case is more than a cost of litigation; he is an integral part of the remedy. "The special master's role and his function are not comparable to the more limited responsibility which persons of like title customarily perform in the context of private civil litigation. This is not a situation where the Court has appointed a person to perform an accounting or compute damages...." *Armstrong v. O'Connell*, 416 F.Supp. 1325, 1336 (E.D.Wis. 1976), *vacated and remanded*, 566 F.2d 1175 (7th Cir.1977). In public law litigation, a special master who is assigned the task of devising a desegregation plan performs a role similar to a court-appointed expert, rather than an accountant. *See Hart v. Community School Board*, 383 F.Supp. 699, 765–66 (E.D.N.Y.1974) (discussing use of special masters as experts), *aff'd*, 512 F.2d 37 (2d Cir.1975). Just as this court could order HUD to pay the cost of transferring tenants in order to achieve racial desegregation in housing, it can require the federal government to compensate the master as part of the affirmative relief to be awarded the plaintiffs.

Yet, HUD argues that, even if the court could enter an order requiring equitable relief, the equitable power of the court does not extend to mandating monetary relief in the form of imposition of the fees and expenses of a special master. May 23, 1986 Hearing. Sovereign immunity, however, does not eliminate all claims seeking affirmative action by government officials. *Saine v. Hospital Authority of Hall County*, 502 F.2d 1033, 1036 (5th Cir.1974). Therefore, it does not prevent the entry of orders that make necessary the expenditure of federal funds as part of the specific equitable relief in an action.

"[T]o avoid the bar of sovereign immunity, courts [have] indulged in the fiction that a federal official acting in violation of the Constitution or beyond his statutory powers was acting for himself only and not as an agent of government." *Geyen v. Marsh*, 775 F.2d 1303 (5th Cir.1985). Thus, a federal officer's unconstitutional or unauthorized actions could be the basis for a suit seeking specific relief, including the recovery of specific monies or an injunction, against the officer as an individual. *Dugan v. Rank*, 372 U.S. 609, 623, 83 S.Ct. 999, 1007, 10 L.Ed.2d 15 (1963). An exception was developed to those exceptions to sovereign immunity based on footnote 11 in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). The footnote states that:

> a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionable sovereign property.

---

20. The federal government has also been ordered to pay the fees and expenses of court-appointed expert witnesses, even before 28 U.S.C. §§ 1920 and 2412 were amended to add the compensation of a court-appointed expert as a taxable cost. *See United States v. Articles ... Provimi*, 425 F.Supp. 228, 231 (D.N.J.1977) (show cause order proposing to assess each party one-half of the cost of the expert's services in conducting study, preparing report, and testifying); *United States v. R.J. Reynolds Tobacco Co.*, 416 F.Supp. 313, 316 (D.N.J.1976) (rejecting the government's argument that federal law precluded it from paying the fees and expenses of a court-appointed expert witness).

*Id.* at 691 n. 11, 69 S.Ct. at 1462 n. 11. The Fifth Circuit has interpreted that footnote as precluding claims against the United States for monetary damages, *Unimex, Inc. v. United States Department of Housing and Urban Development,* 594 F.2d 1060, 1062 (5th Cir.1979), but not all suits for affirmative relief. *Saine,* 502 F.2d at 1037. Instead, the appellate court, following an approach adopted by the Court of Appeals for the Ninth Circuit, determined that sovereign immunity prevented only those suits in which "the relief sought would work an intolerable burden on governmental functions, outweighing any consideration of private harm." *Id.* (quoting *State of Washington v. Udall,* 417 F.2d 1310, 1318 (9th Cir.1969)); *see also Clark v. United States,* 691 F.2d 837, 841 (7th Cir.1982) (adopting the Ninth Circuit's narrow interpretation of footnote 11). In this action, the requirement that the United States pay half of the costs of the master to oversee the agency's remedial efforts and to recommend further action to bring the agency into compliance with the Constitution is not an intolerable burden on the government,[21] nor does the required payment outweigh the harm that the plaintiffs have suffered from HUD's discriminatory conduct.

### C. Statutory Waiver

In addition, the Administrative Procedures Act ("APA") also waives sovereign immunity in this action. *Young v. Pierce,* 628 F.Supp. 1037, 1058 (E.D.Tex.1985). The act provides:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States....

5 U.S.C. § 702. Congress passed that provision to eliminate the fictions surrounding sovereign immunity and to acknowledge

that actions challenging the official conduct of federal employees are actions against the United States. *Geyen v. Marsh,* 775 F.2d 1303, 1307 (5th Cir.1985). In waiving sovereign immunity for suits seeking nonmonetary relief through nonstatutory judicial review, *id.,* Congress did retain the prohibition against suits for money damages.

Although the Fifth Circuit in *Geyen v. Marsh* referred to the APA as allowing "suits for nonmonetary relief," the decision did not address the meaning of "money damages." The Court of Appeals for the District of Columbia, however, has distinguished between money damages, which normally refers to a sum of money used as compensatory relief, and specific remedies, which give the plaintiff the very thing to which he is entitled. *Maryland Department of Human Resources v. Department of Health and Human Services,* 763 F.2d 1441, 1446–48 (D.C.Cir.1985). *But see New Mexico v. Regan,* 745 F.2d 1318, 1321 n. 3 (10th Cir.1984) (interpreting money damages to mean monetary relief), *cert. denied,* —— U.S. ——, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985). After reviewing the Tenth Circuit opinion in *New Mexico v. Regan* and considering the legislative history of the APA waiver of sovereign immunity, the District of Columbia Circuit concluded that Congress intended to authorize equitable suits for specific monetary relief, even when the claims would result in the payment of money from the federal treasury. *Id.* at 1447; *accord Jaffee v. United States,* 592 F.2d 712, 719 (3d Cir.) (finding a claim of medical attention barred by sovereign immunity but permitting a equitable claim for warning, even though it required an expenditure of money), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). Under that view, which will be adopted here, the APA's waiver of sovereign immunity permits this court to order the federal government to pay half of the costs of the special master's fees and expenses. *Cf. Robbins v. Reagan,* 616

---

**21.** The appointment of a master may save the defendants costs that would be expended under a remedial plan that was not tailored to the needs of the diverse circumstances of the class.

F.Supp. 1259, 1273 (D.D.C.1985) (holding that sovereign immunity does not bar a claim seeking to compel the United States to expend money to renovate a shelter for the homeless), *aff'd*, 780 F.2d 37 (D.C.Cir. 1985).

To adopt the government's argument that it cannot be forced to pay the master's fees would eviscerate the remedial powers of courts of equity. The power to appoint a master is meaningless without the authority to order the payment of his fees and expenses.[22] The Court of Appeals for the Eighth Circuit overruled a similar refusal by the United States to pay the fees and expenses of witnesses subpoenaed by indigent civil defendants. " 'The simple question is: Should the government deny a "use permit" in the National Forest and only be subjected to judicial review if those denied have money to fight?' " *United States Marshals Service v. Means*, 741 F.2d 1053, 1059 (8th Cir.1984). In the context of this action, the comparable question is whether the United States can only be subjected to the payment of the costs of a special master when the plaintiffs have money to finance the development of court-ordered desegregation plans prior to entry of a judgment. Acceptance of the government's position would mean that it could control the remedy in any action in which it was found in violation of the Constitution, so long as the remedy required any expenditure of government funds. The federal government cannot hide behind the immunity doctrine to avoid spending money for a remedy, no more than it can hide behind the Constitution to perpetuate the race discrimination that it has helped create.

There are three bases for a waiver of sovereign immunity in this action. Congress has waived sovereign immunity in § 2412(a) of the Judicial Code and in the Administrative Procedures Act; the judiciary has carved exceptions to the doctrine when a federal official acts in violation of the Constitution. Therefore, in the final order of reference, HUD will be directed to pay half of the cost of a special master to monitor its remedial efforts and to develop an effective desegregation plan.

22. *See Ex Parte Peterson*, 253 U.S. 300, 315, 40 S.Ct. 543, 548, 64 L.Ed. 919 (1920) (the power to appoint a special master without the consent of the parties depends, as a practical matter, on the court's power to tax the expense as costs); *cf. United States Marshals Service v. Means*, 741 F.2d 1053, 1058 (8th Cir.1984) (rejecting the government's argument that any fees and expenses of witnesses called by the court must be paid out of the court's fund, for "to allow the court to call witnesses without providing some mechanism for payment of their fees and expenses would be meaningless").